## CATHOLIC BISHOP . OF NESQUALLY *v.* GIBBON.

APPEAL ·FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WASHINGTON. .

No 277. Argued April 9, 10, 1895. — Decided May 6, 1895.

No question as to jurisdiction in this case having been taken in the court below.or here, this court waives the inquiry whether an objection to the jurisdiction might not, if seasonably taken, have compelled a dismissal.

In the administration of the public lands, the decisions of the land department upon questions of fact are conclusive, and only questions of law can be reviewed in the courts.

In the absence of some specific provision to the contrary in respect of any particular grant of public land, its administration falls wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision and direction of the Secretary of the Interior.

The decision of the Secretary of the Interior of March 11, 1872, sustaining the claim of the plaintiff in error to a small tract — less than half an acre — of the 640 acres claimed under the act of August 14, 1848, c. 177, 9 Stat. 323, if not conclusive upon the plaintiff in law, was right in fact.

In section 1 of the act of Congress of August 14, 1848, c. 177, establishing the territorial government of Oregon, is the following proviso : " Provided, also, That the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations. among the Indian tribes in said Territory, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations respectively belong." 9 Stat. 323. Oregon as then organized included all that region west of · the Rocky Mountains and north of the forty-second degree of north latitude, part of which became afterwards the Territory and later the State of Washington.

In February, 1887, the appellant, as plaintiff, commenced a suit in the District Court of the Second Judicial District of Washington Territory against the defendants, John Gibbon, T. M. Anderson, and R. T. Yeatman. In the ·bill then filed the plaintiff alleged that under and by virtue of the forego-

ing proviso it was entitled to a tract of 640 acres, at and adjacent to the present town of Vancouver, 430 acres of which were in the occupancy of the defendants as officers and soldiers of the United States, who held the same as a military reservation; and the prayer was for an injunction, a decree of title, and a surrender of possession. Under the direction of the Attorney General the United States attorney for the Territory of Washington entered the appearance of the United States, and filed an answer in behalf of all of the defendants. While the case was pending in the territorial courts, Washington was admitted as a State, and the case was thereupon transferred to the Circuit Court of the United States for the District of Washington. In that court, upon pleadings and proof, a decree was entered in favor of the defendants dismissing the bill. 44 Fed. Rep. 321. From such decree the plaintiff appealed to this court.

*Mr. A. H. Garland* and *Mr. H. J. May* for appellant. *Mr. Rufus C. Garland* was on their brief.

*Mr. Solicitor General* for appellees.

Mr. JUSTICE BREWER delivered the opinion of the court.

No question was raised in the pleadings or otherwise on the record as to the jurisdiction of the court below over a controversy of this character, but the case was heard and disposed of by the Circuit Court on the merits of the plaintiff's claim. It has been in like manner argued in this court, and, therefore, waiving the inquiry whether the objection to the jurisdiction might not, if seasonably taken, have compelled a dismissal, we shall proceed to consider the merits.

In this case a large volume of testimony has been taken, which it would be a waste of time to attempt to review in detail. Notwithstanding some conflict in minor matters, there is little difficulty in determining what was the true situation of affairs at Vancouver at the time of the passage of the act of 1848. To a clear understanding of that situation, a brief historical statement of preceding events is necessary. Some

years prior to 1838 the Hudson Bay Company had established a trading post at Vancouver. This was done under the assumption that it was within the British possessions. In and about this post were gathered quite a number of employés of the company. It was purely a trading post, with the buildings, appurtenances, and employés naturally attached to such a post established far from civilization and in the midst of the Indian country. Many of these employés were Catholics. In the year 1834–1835 these Catholics forwarded petitions to the Bishop of Juliopolis to send missionaries to them. To these applications the bishop, on June 6 and 8, 1835, made responses, the first being a letter to Dr. McLaughlin, of the Hudson Bay Company, reading as follows:

" Sir : I have received last winter and this spring a petition from certain free families, established on the river Willamette, requesting the help of missionaries to instruct their children and themselves. My intention is to use all my efforts to procure their request as soon as I can. I have no priests at my disposal at Red River, but I will make a trip to Europe this year. I intend to make it my business to procure these free people and the Indians afterwards the means of knowing God. I send together with this an answer to the petition I have received. I request that you please forward it to them. I join with it some catechisms which might be useful to those people if anybody can read among them. Those persons say they are protected by you. Please induce them to do their best and to deserve by a good behavior to profit by the favor they ask. I have the honor to be, sir,

"Your most humble ob't serv't,

"+ I. N.,
" *Bishop of Juliopolis.*
" 6 June, 1835 — Red River."

The other, enclosed with it, commences as follows:

"To all the families established on the Willamette River and other Catholic persons beyond the Rocky Mountains, greeting and benediction:

" I have received, my dearest brethren, your two petitions, the one dated 3d July, 1834, and the other 23d February, 1835. Both ask for missionaries to teach you and your children. Such a request from people deprived of all religious help could not fail to touch my heart. Indeed, if I had it in my power I would send you some, even this year, but I have no priests at my disposal at Red River. I must get some from Canada or elsewhere, which requires time. I will give it my attention during a trip I am going to make in Canada and Europe this year. If my efforts are successful I will send you help very soon. My intention is not only to procure to you and your children the knowledge of God, but also the numerous Indian tribes among which you live. I exhort you meanwhile to deserve, by a good behavior, that God may help my undertaking."

Subsequently, and on April 17, 1838, the Bishop of Quebec sent Francis Norbert Blanchet and Modeste Demers as missionaries into this region, giving them a letter of instructions, from which we quote the following:

" Instructions for Messrs. Francis Norbert Blanchet and Modeste Demers, priests, appointed missionaries for that portion of the diocese of Quebec which is situate between the Pacific Ocean and the Rocky Mountains:

" 1st. They must consider as the first object of their mission to draw from barbarity and the disorders which follow from it the Indian nations spread in that country.

" 2d. The second object is to lend their services to the bad Christians who have there adopted the morals of the Indians and live in licentiousness and the forgetfulness of their duties.

" 3d. Convinced that the preaching of the gospel is the safest means of obtaining these happy results, they will lose no opportunity of inculcating its principles and its maxims either in their private conversations or in their public instructions.

" 4th. In order more promptly to render themselves useful to the nations of the country where they are sent, they will from the first moment of their arrival apply themselves to the study of the Indian languages, and will endeavor to

reduce them to regular principles so as to be able to publish a grammar of them after some years of residence.

" 5th.  They will prepare for baptism with all possible haste the infidel women who live in a state of concubinage with Christians, in order to replace those irregular by lawful marriages.

" 6th.  They will apply themselves with a particular care to the Christian education of the children, establishing for that purpose, as much as their means will afford them, schools and catechisms in all the villages which they will have occasion to visit.

*    *    *    *    *

" 9th.  The territory which is particularly assigned to them is that which is comprised between the Rocky Mountains at the east, the Pacific Ocean at the west, the Russian possession at the north, and the territory of the United States at the south.  It is only in that extent of territory that they will establish missions, and it is particularly recommended to them not to form any establishment on the lands the possession whereof is contested by the United States.  They will be allowed, however, in conformity with the indult of the Holy See, dated February 28, 1836, a copy of which accompanies the present, to exercise, when needed, their faculties in the Russian possessions as well as in that part of the American territory which joins their mission.  As to that part of the territory, it is probable that it does not belong to any of the dioceses of the United States, but if the missionaries are informed that it is a part of some dioceses, they will abstain from exercising any act of jurisdiction there in obedience to the indult cited above unless they be authorized to it by the bishop of such diocese.

" 10th.  As to the place where they will fix their principal residence it will be on the river Cowlitz or Kowiltyhe, which empties into the river Columbia on the north side of this last river; on their arrival at Fort Vancouver they will present themselves to the person who then represents the honorable Hudson Bay Company, and they will take his advice as to the precise situation of that establishment.

"11th. They are particularly recommended to have all possible regard for the members and employés of that company with whom it is very important for the holy work with which they are charged, to be constantly in good intelligence.

"12th. As they cannot rely entirely upon the resources from the Association for Propagation of the Faith, established a year ago in this diocese, to provide for their sustenance and the construction of the chapels and houses which they will establish in various places of their mission, they will induce the white inhabitants and the nations of the country to contribute for these objects as much as their means will allow them.

\*          \*          \*          \*          \*

"14th. The territory where this mission is — be established having been annexed by the indult of the 28th of February, 1836, mentioned above to the Territory of the Northwest, the spiritual government of which is entrusted to the Right Reverend Bishop of Juliopolis, the new missionaries will correspond as regularly as possible with that prelate, whom they will also inform of the state of their mission and whose orders and counsels they will receive with submission and respect."

With these instructions the two parties named proceeded to the territory of Oregon, and arrived at Vancouver on November 24, 1838. The former of the two was still living when this case was commenced, and his testimony was taken, he being at the time Archbishop of Oregon City. He testified that in connection with his associate he established a Catholic mission station at Vancouver, as well as at two or three other places in Oregon; that when they established the Vancouver station there were many Indians in the neighborhood, and that they did a great deal of missionary work among them. After describing the character of that work, and stating that the missionary station was kept up from the year 1838 to the fall of 1844, at which time he left for Europe and did not return until August, 1847, he added this testimony:

"Int. 34. From 1838 to the time you left Oregon in 1844, where were religious services held at Vancouver?

"Ans. In an old store inside the pickets.

"Int. 35. Was that room or building during that time used for any other than religious and missionary services and labors?

"Ans. It was used only for Catholic religious services and missionary labors.

"Int. 35½. State who attended services then in that building.

"Ans. Servants of the Hudson Bay Company, their wives and children, Indians of the place and neighborhood — Dr. McLaughlin often came — and others.

"Int. 36. Before 1844 had you purchased or obtained any place or building at Vancouver outside of the pickets or fort of the H. B. Co. for any purpose whatsoever?

"Ans. I had not purchased, but had obtained a piece of ground that was intended for the building of a church for this station. The company was not willing to sell; that piece of ground was shown to me from the saw-mill west and including the present site. We were allowed to fence it, but our means did not allow us to do so. This land was east of the present Catholic church and near an old mill or mills, and extended thence west, but I do not well recollect now how far west it came. I think the church now stands on this land. Before I left for Europe I recommended Rev. M. Demers to build a church on that land.

"Int. 37. By whom was this land shown to you?

"Ans. To the best of my recollection it was by James Douglas, Esq., chief factor of the company and governor of the F. V. in absence of Dr. McLaughlin.

"Int. 38. Did you or not before leaving Oregon in 1844 purchase any building at Vancouver?

"Ans. Yes; I did, from one of the company's servants.

"Int. 39. What building and for what purpose?

"Ans. For the purpose of teaching Indians and the Indian women, and children of the company's servants outside the fort.

"Int. 40. State whether or not you used that building as a place for the instruction of the Indians at Vancouver and in its vicinity.

"Ans. Yes; we did.

"Int. 41. When did you buy that building?

" Ans. I think in 1839 or 1840.

" Int. 42. Was it in use by you for the same purpose up to the time you left Oregon in 1844 ?

" Ans. That I can't say ; I suppose it was.

" Int. 43. On your return to Vancouver in 1847 in what condition did you find this mission station, and who was, if any one, in charge as the missionary priest ?

" Ans. I found the mission station in charge of Vicar General Demers.

" Int. 44. Where were the religious services then held ?

" Ans. In the present church building.

" Int. 45. Since then do you know whether any repairs or improvements have been made upon this building ; and, if yea, by whom and when ?

" Ans. I have been told that some repairs have been made ; of my own knowledge I know repairs have been made of late years. These repairs have all been at the expense of the Bishop of Nesqually.

" Int. 46. State whether or not there was a Catholic mission station at Vancouver amongst the Indian tribes on the 14th day of August, 1848.

" Ans. There was ; Father Delavane was the head of the station. He was appointed to this station in 1847 by me after my arrival from Europe. This part of the country was not a part of my diocese, but it was under my jurisdiction.

" Int. 47. Was it the same missionary station you had founded in 1838 ?

" Ans. It was the same.

" Int. 48. Whether or not there has been a Catholic church and service here since then until now.

" Ans. Yes, sir."

He stated that no Catholic priest was ever, by contract or otherwise, a chaplain to the Hudson Bay Company at Vancouver ; that the Hudson Bay Company granted them £100 per year as an acknowledgment of their services. He further testified :

" Int. 72. From the time of your coming to the country in '38 to the fall of 1844, where did you live when at Vancouver ?

"Ans. Inside of the pickets, in a room of the H. B. Co.

"Int. 73. State whether or not you ever paid to the Co. anything for your board.

"Ans. Never.

"Int. 74. State whether or not you ever offered to pay them for your board.

"Ans. Yes, sir; when I had bought that little house we were afraid to be too much charge to the Co. I told the governor we would live outside and pay the expense of our living. The answer made was that we were not a burden to the H. B. Co. I said we were afraid we were troublesome to the Co. The answer was as I have above stated. The Co. or its officers were very kind and generous to us."

Cross-examination:

"Int. 2. In 1848 was the mission in possession of any land?

"Ans. It was in possession of the land where the church is.

"Int. 3. From what source did it get that land?

"Ans. From Mr. Douglas, who showed me the place. This was done at my request, that we might have a more established place.

"Int. 4. Did the mission ever acquire any right to that land except by the consent or permission of Mr. Douglas?

"Ans. No; it did not; there was no other way.

"Int. 5. Has the mission ever claimed to exercise ownership over any part of the land except that on which the church is built?

"Ans. No; we did not, except what was granted for the church, and we expected to have a deed for the land from the Hudson Bay Co. when the Co. could give one.

"Int. 6. In 1848 where did Mr. Delavane reside?

"Ans. Inside of the pickets of the H. Bay Co.

"Int. 7. Where in 1849, and till he left?

"Ans. In the same place.

"Int. 8. Did you or any other priest before 1850 live anywhere about Vancouver except within the Co.'s pickets?

"Ans. No, sir.

"Int. 9. From whom did you buy the small house spoken of by you in your testimony?

" Ans. I don't recollect the name.

" Int. 10. Where was it?

" Ans. West of the fort.

" Int. 11. Did not the company own all the buildings occupied by its servants?

" Ans. I think not. They belonged to the servants and they sold them.

" Int. 12. Did you buy any land with the house?

" Ans. No, sir.

" Int. 13. Did you buy anything but the use of the house?

" Ans. I bought the house.

" Int. 14. Did the company know you bought it?

" Ans. I suppose they did.

" Int. 15. How much did you give for it?

" Ans. Between twenty and twenty-five dollars.

" Int. 16. Who erected the church?

" Ans. The Hudson's Bay Company or Mr. Douglas.

" Int. 17. Did you ever pay anything for its erection?

" Ans. No, sir."

We have quoted thus fully from the testimony of this witness, because of his early and continued relations to the church work at Vancouver, and because the other testimony offered in behalf of the plaintiff 'is really nothing more than in corroboration. It discloses very clearly what was the character of the mission establishment at Vancouver, what its occupation was, and what the extent of its work and its relation to the Hudson Bay Company.

Under the treaty of June 15, 1846, between the governments of the United States and Great Britain it was provided:

" The possessory rights of the Hudson's Bay Company and of all British subjects who may be already in the occupation of land or other property lawfully acquired within the said territory, shall be respected." 9 Stat. 870.

On July 1, 1863, another treaty was concluded between the parties, which, reciting that " it is desirable that all questions between the United States authorities on the one hand, and the Hudson's Bay and Puget's Sound Agricultural Companies on the other, with respect to the possessory rights and claims

of those companies, and of any other British subjects in Oregon and Washington Territory, should be settled by the transfer of those rights and claims to the government of the United States for an adequate money consideration," provided for the appointment of a commission to examine and decide upon all such claims.     13 Stat. 651.     This commission awarded $650,000 in full satisfaction of these claims, which award was accepted by the United States, and on July 11, 1870, a joint resolution was passed, making an appropriation on account thereof.     16 Stat. 386.

In May, 1849, Major Hathaway, of the United States army, with a company of soldiers, arrived at Vancouver and rented from the Hudson Bay Company buildings for quarters for his troops, and, with the consent of the company, established a camp upon the land in dispute. · In October, 1850, Colonel Loring, commanding the United States troops at that place, issued a proclamation creating a military reservation four miles square, with definite boundaries, and including this land. This proclamation declared the reservation to be subject only to the temporary possessory rights of the Hudson Bay Company, and that all improvements within the limits of the reservation would be appraised and payment recommended.     On December 8, 1854, Colonel Bonneville, commanding officer at Vancouver, pursuant to instructions from the Secretary of War, and in conformity to an act of Congress, approved February 14, 1853, (10 Stat. 158,) reduced the area of the reservation to 640 acres, caused the same to be surveyed, and new boundaries marked.     At the same time the buildings and improvements on the reservation, including the Catholic church, were appraised by a board of military officers.     On May 16, 1853, the plaintiff asserted its claim to the land by filing a notice thereof with the surveyor general of Oregon Territory.     This application was followed up by proceedings in the land department, which resulted in a final decision by the Secretary of the Interior on March 11, 1872, sustaining the claim of the plaintiff to a small tract (less than half an acre) upon which the building used as a church was situated, and denying it as to the rest of the land.     On the 15th of

January, 1878, the President approved a final survey and plat of the military reservation, confirmed the previous action of the War Department, and declared the reservation to be duly set apart for military purposes.

Upon these facts, it may well be doubted whether the decision of the Secretary of the Interior is not conclusive. The act of Congress purports to confirm " the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations." It is a question of fact whether there was at Vancouver a missionary station, and also a like question, if one existed, how much land it occupied. The rule is that in the administration of the public lands the decision of the land department upon questions of fact is conclusive, and only questions of law are reviewable in the courts. *Johnson* v. *Towsley,* 13 Wall. 72 ; *Warren* v. *Van Brunt,* 19 Wall. 646 ; *Shepley* v. *Cowan,* 91 U. S. 330 ; *Moore* v. *Robbins,* 96 U. S. 530 ; *Marquez* v. *Frisbie,* 101 U. S. 473 ; *Vance* v. *Burbank,* 101 U. S. 514; *Quinby* v. *Conlan,* 104 U. S. 420 ; *Smelting Co.* v. *Kemp,* 104 U. S. 636 ; *Steel* v. *Smelting Co.,* 106 U. S. 447 ; *Baldwin* v. *Stark,* 107 U. S. 463 ; *United States* v. *Minor,* 114 U. S. 233 ; *Lee* v. *Johnson,* 116 U. S. 48 ; *Wright* v. *Roseberry,* 121 U. S. 488 ; *Cragin* v. *Powell,* 128 U. S. 691 ; *Knight* v. *U. S. Land Association,* 142 U. S. 161 ; *United States* v. *California & Oregon Land Co.,* 148 U. S. 31 ; *Barden* v. *Northern Pacific Railroad,* 154 U. S. 288, 327.

While there may be no specific reference in the act of 1848 of questions arising under this grant to the land department, yet its administration comes within the scope of the general powers vested in that department. Revised Statutes, section 441, reads : " The Secretary of the Interior is charged with the supervision of public business relating to the following subjects : . . . Second. The public lands, including mines." And section 453 provides that " the Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the survey and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land."

Referring to this latter section, and particularly the clause "under the direction of the Secretary of the Interior," it was said by Mr. Justice Lamar, speaking for the court in *Knight* v. *Land Association*, 142 U. S. 161, 177: "It means that, in the important matters relating to the sale and disposition of the public domain, the surveying of private land claims and the issuing of patents thereon, and the administration of the trusts devolving upon the government, by reason of the laws of Congress or under treaty stipulations, respecting the public domain, the Secretary of the Interior is the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States." See also *Barden* v. *Northern Pacific Railroad*, 154 U. S. 288, and cases cited in the opinion. It may be laid down as a general rule that, in the absence of some specific provision to the contrary in respect to any particular grant of public land, its administration falls wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision of the Secretary of the Interior. It is not necessary that with each grant there shall go a direction that its administration shall be under the authority of the land department. It falls there unless there is express direction to the contrary.

But the contention of the plaintiff is that there was error in the construction of the statute and in respect to a matter of law. It not only concedes, but also insists, that the award to the plaintiff of the ground upon which the church was situated amounts to a determination by the land department that there was at the date of the act a Catholic mission at Vancouver, and, relying upon the authorities we have quoted, it claims that such determination is conclusive as to that fact. It insists further, that the grant made by the proviso was of 640 acres, and says that the existence of a Catholic mission having been as a matter of fact conclusively established, entitles the plaintiff as a matter of law to the 640 acres surrounding the mission. We do not so understand the terms of the grant. It is not a grant certain of 640 acres. The language is "not exceeding 640 acres." This places a limit in area beyond which the grant may not go, but does not define what is

granted. For that we must look elsewhere in the proviso, and the description is partly found in the words " now occupied." This is not a grant new and absolute of so many acres, but a confirmation of rights flowing, or supposed to flow, from occupancy. In *Missionary Society* v. *Dalles*, 107 U. S. 336, 343, this very question was before the court for consideration. The facts in that case were that in 1836 the Methodist Episcopal Church established a missionary station at The Dalles, in Oregon. In 1847 that church transferred the station to the American Board of Commissioners for Foreign Missions. The American Board continued in occupation for a short time, but one of its missionaries having been murdered by the Indians, it, through fear of Indian hostility, temporarily at least abandoned the mission, and at the date of the passage of the act of August 14, 1848, there were no missionaries at The Dalles, and no station in actual occupancy. The next year the American Board restored the station to the Methodist Episcopal Church, and in June, 1850, the latter caused a survey to be made of 640 acres, for the purpose of a claim under this proviso. The court held that the claim of the applicant could not be sustained, saying, after referring to the act: " The words are ' now occupied.' To occupy means to hold in possession ; to hold or keep for use ; as to occupy an apartment. Webster's Dictionary. The appellant contends that this act confers title on it for lands which it did not occupy at the date of the act, but which it had voluntarily abandoned eleven months before, and the occupancy of which it never resumed, either for missionary or any other purposes. Not even a liberal construction would support such a claim."

From this it appears that there must be occupancy, and the extent of the occupancy is one limit of the grant. This occupancy must be independent and separate, and not inferior and subordinate. It must be an occupancy in one's own right, and not under and dependent upon another.

This act of Congress is not exceptional in its character but in line with the general course of legislation in respect to the settlement and development of our western territories. The pioneer has always been regarded as entitled to favorable

consideration, and while his occupancy has not been deemed of itself sufficient to establish title to the soil, yet it-has been held to give him certain possessory rights which are the subject of contract, and create a superior equity in respect to the acquisition of title. *Lamb* v. *Davenport*, 18 Wall. 307, illustrates this. In early days one Lownsdale settled upon a tract of land in Oregon, on which is now the city of Portland. Certain transactions were had between him and others in respect to that land prior to the acquisition of title, and the validity of those transactions was the subject-matter of this litigation, and in respect thereto the court said, on page 314:

"Of course, no legal title vested in any one by these proceedings, for that remained in the United States — all of which was well known and undisputed. But it was equally well known that these possessory rights, and improvements placed on the soil, were by the policy of the government generally protected, so far, at least, as to give priority of the right to purchase whenever the land was offered for sale, and where no special reason existed to the contrary. And though these rights or claims rested on no statute, or any positive promise, the general recognition of them in the end by the government, and its disposition to protect the meritorious actual settlers, who were the pioneers of emigration in the new territories, gave a decided and well-understood value to these claims. They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid. The right of the United States to dispose of their own property is undisputed, and to make rules by which the lands of the government may be sold or given away is acknowledged; but, subject to these well-known principles, parties in possession of the soil might make valid contracts, even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where Congress had imposed restrictions on such contracts."

*Rector* v. *Gibbon*, 111 U. S. 276, is even more closely in point In that case, three parties, Rector, Hale, and Gaines, had for a series of years claimed lands adjacent to the Hot Springs, in the State of Arkansas. Finally, in a suit which came to this

court (*Hot Springs Cases*, 92 U. S. 698) it was adjudged that neither of these claimants had any title to the land, but that it still remained the property of the United States. Subsequently an act was passed (19 Stat. 377) for a survey of the tract and the platting of the same into lots and blocks, and providing that the commissioners appointed to make the survey and plat should "finally determine the right of each claimant or occupant to purchase the same, or any portion thereof, at the appraised value, which shall be fixed by the commissioners." One Ballantine was in occupation of certain premises under a lease from Rector, one of the claimants. The commissioners awarded the right of purchase to Ballantine, but this court held such award erroneous, and that the right of purchase was in Rector, the landlord, the court saying, on page 283 :

"The government did not treat him and the other claimants as wanton intruders on the public domain, for then it might have ejected them by force. Instead of that it authorized proceedings for a judicial ascertainment of the merits of their respective claims. The act of 1877 embraces, therefore, under the designation of claimants and occupants, those who had made improvements, or claimed possession under an assertion of title or a right of preëmption by reason of their location or settlement. It was for their benefit that the act was passed, in order that they should not entirely forfeit their claims from location or settlement and their improvements, but should have, except as to the portions reserved, the right of purchase. Parties succeeding, by operation of law or by conveyance, to the possession of such claimants and occupants, would succeed also to their rights. But lessees under a claimant or occupant, holding the property for him, and bound by their stipulation to surrender it on the termination of their lease, stand in no position to claim an adverse and paramount right of purchase. Their possession is in law his possession. The contract of lease implies not only a recognition of his title, but a promise to surrender the possession to him on the termination of the lease. They, therefore, whilst retaining possession, are estopped to deny his rights. *Blight's Lessee* v. *Rochester*, 7 Wheat. 535.

"This rule extends to every person who enters under lessees with knowledge of the terms of the lease, whether by operation of law or by purchase and assignment. The lessees in this case, and those deriving their interest under them, could, therefore, claim nothing against the plaintiff by virtue either of their possession, for it was in law his possession, or of their improvements, for they were in law his improvements, and entitled him to all the benefits they conferred, whether by preëmption or otherwise."

So, in the act before us, Congress, recognizing certain possessory rights, flowing from occupancy, made a donation to the occupant of the premises so occupied to the extent of not exceeding 640 acres. That this was a donation instead of a grant of the right to purchase is immaterial. The donation feature was inserted because of the benefits supposed to flow from the religious work of the mission, and proceeded upon the same principle that exempts from taxation the property of religious organizations. But the occupancy which was contemplated was an independent occupancy — one exercised by the mission in its own right. No such occupation appears here. The real occupant was the Hudson Bay Company; it had the possessory right. It had been in occupation long before the coming of the two missionaries, and whatever occupation the mission station had was under and by permission of the Hudson Bay Company. It was no more than a tenant at will or by sufferance. The United States, by treaty prior to this act, guaranteed to protect the possessory rights of the Hudson Bay Company, and it cannot be supposed that they intended by this act to ignore those rights and grant away the land to those who occupied under the company and by its sufferance. If it be said that by giving permission to the purchaser to build a church and occupy it the Hudson Bay Company vacated and surrendered its own possession, it only did so to the extent of the ground actually occupied by such church and buildings. So, if the award by the Secretary of the Interior is a decision that there was in fact a Catholic mission at Vancouver, it is also a decision of the further fact that its occupation was limited to the tract awarded. There

is nothing in the record to impeach his action, and if the question were an open one, and to be tried *de novo*, there is in the record no sufficient testimony to justify any other conclusion. The situation is not dissimilar to that which would arise if some religious organization should come into the city of Washington and acquire title to a certain lot, and erect thereon a building. No one would think of saying that thereby it became the occupant of the city. Its occupation would be limited to the lot it bought and placed its building upon.

These considerations are decisive of this case. The decree of the Circuit Court is

*Affirmed.*