# UNITED STATES EX REL ROCHE *v.* HITCHCOCK, SECRETARY OF THE INTERIOR.

PUBLIC LANDS; MANDAMUS.

1. The administration of any particular grant of public land is wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision of the Secretary of the Interior, in the absence of any specific provision to the contrary.

2. The writ of mandamus will not lie to control the exercise of the judgment and discretion vested in the Secretary of the Interior, in the matter of delivering to the relator a certificate for entry and location upon the public lands, where, in refusing to deliver the same, he

construes statutes which, the relator claims, give him the right to locate any unlocated part of an original grant of 640 acres, as having given to the original grantee only the land claimed and actually settled upon by him, not to exceed 640 acres, and under which the claim was fully satisfied when the settler located upon the land he selected, although it was of less quantity than 640 acres.

Submitted November 7, 1906.   Decided November 20, 1906.

HEARING on an appeal by the relator from an order of the Supreme Court of the District of Columbia discharging a rule to show cause, and dismissing a petition for the writ of mandamus against the Secretary of the Interior.       *Affirmed.*

The COURT in the opinion stated the facts as follows:

The appellee, Leonard Roche, filed a petition for a writ of mandamus to the Secretary of the Interior to compel delivery of certain land certificates issued originally to Philemon Chance. The petition alleges that June 7, 1813, the Special Commissioner, under authority of a statute then in force, reported a land claim of Philemon Chance against the United States for a donation of 640 acres of land, being claim No. 140 on the Commissioner's list of actual settlers. That by section 3 of the act of Congress approved March 3, 1819, the said claim was confirmed against the United States for 640 acres, and was surveyed for 338 acres only, thereby remaining unsatisfied to the extent of 302 acres. That petitioner has become the owner of the remainder of said certificate. That on July 28, 1904, he filed his application, accompanied by proof, with the United States Surveyor General for the State of Louisiana, within whose district said claim was situated, and asked that certificates of location or land scrip for the amount of 302 acres, more or less be issued by him to relator under the authority and duty conferred upon said Surveyor General by section 3 of the act of Congress of June 2, 1858. That on the 5th of December, 1904, the said Surveyor General, finding the claim of relator to be such as to entitle him to the certificates prayed for, issued to

relator said land scrip in part satisfaction of said claim for 640 acres, of Philemon Chance, the said certificates or scrip consisting of eight pieces, seven of them for 40 acres each, and the eighth for 21.65 acres. The said Surveyor General, having done all things required by the law of Congress, instead of delivering said scrip to the relator, forwarded it, against the wish and without the consent of the relator, to the Commissioner of the General Land Office at Washington, for the authentication and approval of the said Commissioner. Relator charges that the act of the said Surveyor General in sending the said certificates of location to the Commissioner of the General Land Office for his authentication and approval, instead of delivering the same to the relator, was without any lawful authority whatsoever and contrary to the intent and meaning of the said act of June 2, 1858, and of the laws of the United States relating thereto. That the respondent refused to permit the authentication on the approval or the delivery of the said certificates after the same had been received by his said Department, and still refuses, especially to deliver the same to your relator, notwithstanding it was his plain duty, under the law, to so deliver the same. The petition is accompanied by exhibits of the records of the courts of Louisiana, showing the transition of the relator of title to the unlocated claim of Philemon Chance. Another shows the application of the relator, July 28, 1904, to the Surveyor General of Louisiana, for the issue of said certificates, the same reciting the proceedings by which relator became entitled to the claim. Another exhibit is a letter of the Surveyor General to the Commissioner of the General Land Office, dated December 5, 1904, in which he recites the application of relator for certificates of location and the proceedings under which he claimed title. It was said therein that the claim of Philemon Chance, under settlement made in 1808, in the State of Louisiana, is entered as claim No. 146 in Commissioner Cosby's list of actual settlers, dated June 7, 1813. That the said claim stands confirmed for 640 acres by the 3d section of the act of Congress approved March 3, 1819.

That the records of his office show that the claim of Philemon Chance, No. 146, was surveyed and located under certificate No. 421, in Greensburg District, Louisiana, containing 338.35 acres. That among the old Greensburg papers now in his custody he finds the original certificate of confirmation issued in favor of Philemon Chance by Commissioner Cosby on December 6, 1819. That from the foregoing it appears that the claim of Philemon Chance, which was confirmed as a donation of 640 acres, and which has been surveyed to embrace only 338.35 acres, should have been surveyed to embrace its confirmed area without interfering with claims confirmed by the first two sections of the act of Congress of March 3, 1819; wherefore the said claimant is entitled to indemnity certificates of location under the act of June 2, 1858, to the amount of 301.65 acres, being the deficiency between the confirmed and surveyed area. That on May 26, 1902, certificates of location were issued by him in favor of the said claim, upon the application of J. L. Bradford, attorney for Martindale, curator of the vacant succession of Elias Norwood. That in a decision rendered June 28, 1902, the Commissioner held that Norwood's estate was not entitled to any indemnity scrip that might be due the said claim of Philemon Chance, and held for cancellation the certificate of location issued by this office on May 26, 1902. That said certificate was returned to be canceled in conformity with the usual practice, and the same was returned to the Commissioner, duly canceled as directed in his letter of April 24, 1903. He concludes as follows: "In view of the foregoing facts, I am of the opinion that the present applicant, Mr. Leonard Roche, is entitled to the certificates of location due on the claim of Philemon Chance, entered as claim No. 146 in Commissioner James O. Cosby's list of actual settlers, dated June 7, 1813. I have therefore this day issued, and transmit herewith for your authentication, certificates of location under the act of June 2, 1858, in part satisfaction of the said claim of Philemon Chance."

In answer to the rule to show cause, the Secretary of the In-

terior admits that a land claim was confirmed to Philemon Chance by the 3d section of the act of Congress of March 3, 1819, but denies that a claim was confirmed to said Chance for 640 acres, or for any specific number of acres, or that any part of such claim remains unlocated and unsatisfied. On the contrary, he avers that the claim confirmed to said Chance by the act aforesaid was the land claimed and actually cultivated and inhabited by him prior to the 15th day of April, 1813, and that said claim was located and surveyed about the year 1828, according to the boundaries thereof, and to embrace the land actually occupied, inhabited, and cultivated by said Chance at and prior to April 15, 1813. Admitting the general facts alleged in the petition, defendant, further answering, said that the Commissioner of the General Land Office, in the exercise of his jurisdiction, refused to authenticate said certificates, and from his decision in that behalf relator appealed to the Secretary of the Interior, who, in the like exercise of his jurisdiction and authority, by decision rendered June 21, 1905, sustained the act of the Commissioner in refusing to authenticate said certificates, for the reason that the claim of Philemon Chance had been fully satisfied by the location and survey thereof according to the lines of the original claim of such settler; and no part of said claim remained unlocated or unsatisfied; the certificates claimed by relator were not issued according to the true intent and meaning of the act of June 2, 1858.

A copy of the decision referred to is attached as an exhibit. This, after reciting the facts, states that "at the time of the sale and of the survey the only right the confirmee had was to such land as could be located and surveyed. There was no right of indemnity for any deficiency that might occur by reason of the failure to locate the entire claim by reason of prior rights, or otherwise. It is therefore reasonable to presume that Paxton's purchase was of the entire claim, so that if, as held by your office, the survey of the claim for Paxton would seem to indicate that the deputy surveyor who executed the survey was satisfied that Paxton had acquired title to the land which was

surveyed for this claim, he must also have been satisfied that Paxton had a right to the full extent of the claim as confirmed."

He then quoted the provision of the original act, as follows: *"Provided,* That not more than one tract shall be thus granted to any one person, and the same shall not contain more than 640 acres." Construing this section, he said: "The section does not grant to such settlers 640 acres, but only the land so claimed or settled on, where it appears from said report that the land claimed or settled on had been actually inhabited or cultivated by the settler or his legal representatives. But while every claim was limited to the lines of the actual possession of the claimant, no claim could exceed 640 acres, and no grant was made of any claim to that extent, unless it was contained within the boundaries actually inhabited, cultivated, and occupied by such settler. This was the limit of the grant as to every claim, and it was satisfied in full when it was surveyed and located to embrace the land actually occupied, inhabited and cultivated by the settler."

He then recited the fact that the actual settlement of Philemon Chance was within boundaries which included only the amount surveyed for him and his claim. The decision concludes: "If the act had granted as a donation 640 acres to each settler, to be located, as far as possible, to embrace the land actually occupied, there might be some ground for holding that a failure to locate the full quantity of 640 acres would entitle the grantee or his legal representatives to indemnity for the deficiency under the act of June 2, 1858; but as the grant was solely for the land actually occupied, cultivated, and inhabited, not to exceed 640 acres, the claim is fully satisfied when the settler is located upon the land settled upon."

Another exhibit to the answer is a letter of the Commissioner of the General Land Office, August 26, 1872, to the then Surveyor General of Louisiana, relating to claims under the acts of 1813, 1819, 1822, and 1858. This letter, after reciting the duties of the Surveyor General under said acts in regard to the making of surveys, etc., states: "The law is, in my opinion,

not only clear on these points, but my interpretation of it is sustained by the usage and practice of the office from 1819 to the present time. It was not until the act of June 2, 1858, authorizing the issue of certificates of location, that a claim could be treated as a 'float,' and that act would not have become a law if parties had been previously allowed to locate their claims according to their choice; but as they had been confined to the land settled on and inhabited or cultivated, and the original settlement and inhabitation or cultivation fixed and determined the locality of the claim, and they were not permitted to go elsewhere and take up an equal quantity, and as it sometimes happened that the government, through inadvertence or mistake, disposed of the land embraced in the original claim, Congress undoubtedly thought it just and equitable to give the parties whose land had thus been disposed of the right to locate an equal quantity of other lands, and it provided for the issue of certificates of location to enable them to do so; and thus a claim which before that time had been fixed and confined to a certain place became locatable wherever the party might elect, on lands subject to private sale. But there is nothing in the act of Congress which can be construed to authorize the issue of certificates of location to parties whose claims cannot be located because of conflict with claims held by a prior or superior title, for such claims have never been confirmed, for the good and sufficient reason that the claimants were not settlers on the public domain, but intruders and trespassers on private property.

"In order to guard against and prevent the issue of certificates of location to parties who may not be clearly entitled thereto, you are hereby instructed to require all applicants for such certificates, in making proof of confirmation and nonsatisfaction of a claim, to define and establish, by full and satisfactory evidence, the exact location of the claim according to its original boundaries, and, if the claim is not presented by the original confirmee you will require the assignee or legal representative of such confirmee to prove and show a continuous and

connected chain of title from such confirmee to such assignee or legal representative. Unless the proof is full, explicit, and satisfactory on all the points involved in the investigation, you should decline to issue certificates of location. As the act of June 2, 1858, charges this office with the duty of determining whether such certificates of location are properly issued, you will, in all cases where you issue certificates, forward them to this office for approval, accompanied by the evidence upon which you have based your decision, and also state fully, in a report over your own signature, your reasons for issuing such certificates."

The cause being heard upon the petition and answer, it was ordered that the rule to show cause be discharged and the petition dismissed at the cost of the petitioner. From that judgment this appeal has been prosecuted.

*Mr. J. L. Bradford, Mr. R. C. Thompson,* and *Mr. John E. Laskey* for the appellant.

*Mr. Frank L. Campbell,* Assistant Attorney General, *Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, and *Mr. E. F. Best,* Assistant Attorney, Interior Department, for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The determination of this case involves the consideration of the several acts of Congress on which the appellant's claim is founded.

By act approved April 25, 1812 (2 Stat. at L. 713, chap. 67), the commissioners appointed for the purpose of ascertaining titles and claims to lands in the districts of Louisiana were authorized and required to report to Congress a list of all the actual settlers on lands in said districts whose claims were not derived either from the French, British, or Spanish govern-

ments.   In the list so reported was a claim of Philemon Chance, numbered 146.   An act approved March 3, 1819 (3 Stat. at L. 528, chap. 100), confirmed these claims upon the following conditions:

That every person, or his or her legal representative, whose claim is comprised in the lists, or register of claims, reported by the said commissioners, and the persons embraced in the list of actual settlers, or their legal representatives, not having any written evidence of claim reported as aforesaid, shall, where it appears by the said reports, or by the said lists, that the land claimed or settled on had been actually inhabited or cultivated by such person or persons in whose right he claims, on or before the 15th day of April, 1813, be entitled to a grant for the land so claimed or settled on, as a donation:   *Provided,* That no more than one tract shall be thus granted to any one person, and the same shall not contain more than 640 acres, and that no lands shall be thus granted which are claimed or recognized by the preceding sections of this act.

As alleged in the return to the rule to show cause, the claim of Philemon Chance was surveyed in 1828, and located upon the land claimed and actually occupied by him prior to April 15, 1813, according to the boundaries embracing the same, containing an area of 338.35 acres.   The contention of the appellant is that the act of 1819 confirmed to Philemon Chance the right to 640 acres of land, and his claim is to the unlocated remainder thereof, by virtue of the decision and action of the Surveyor General.

The final act of Congress under which this unlocated remainder is claimed, and which, it is claimed, vested in the Surveyor General the exclusive power to determine the validity of all unsatisfied claims arising under the aforesaid acts of 1812 and 1819, was approved June 2, 1858 (11 Stat. at L. 294, chap. 81).

This act is entitled:   "An Act to Provide for the Location of Certain Confirmed Private Land Claims, in the State of Missouri, and for Other Purposes," and contains four sections.   The

1st section relates to certain enumerated claims in the State of Missouri. Section 2 confirms the decisions of the commissioners under the act of 1812, in the eastern district of the territory of Orleans, among which is included the settler's claim of Philemon Chance.

The 3d section contains the following provision:

" *   *   * that in all cases of confirmation by this act, or where any private land claim has been confirmed by Congress and the same, in whole or in part, has not been located or satisfied, either for want of a specific location prior to such confirmation, or for any reason whatsoever, other than a discovery of fraud in such claim subsequent to such confirmation, it shall be the duty of the surveyor general of the district in which such claim was situated, upon satisfactory proof that such claim has been so confirmed, and that the same, in whole or in part, remains unsatisfied, to issue to the claimant, or his legal representatives, a certificate of location for a quantity of land equal to that so confirmed and unsatisfied; which certificate may be located upon any of the public lands of the United States subject to sale at private entry, at a price not exceeding one dollar and twenty-five cents per acre."

The contention on behalf of the Secretary of the Interior is, as recited in his decision in respect of this claim for the unlocated remainder of 640 acres, rendered June 21, 1905, that the confirmee, Philemon Chance, by the terms of the act of 1819, had the right only to such land as he had in possession at the time the report of the commissioner under the act of 1812 was made, that could be located and surveyed. He said: "The section does not grant to such settlers 640 acres but only 'the land so claimed and settled on,' where it appears from said reports 'that the land claimed or settled on had been actually inhabited or cultivated' by the settler or his legal representatives. But while every claim was limited to the lines of the actual possession of the claimant, no claim could exceed 640 acres, and no grant was made of any claim to that extent unless it was contained within the boundaries actually inhabited, cultivated, and occupied

by such settlers. This was the limit of the grant as to every claim, and it was satisfied in full when it was surveyed and located to embrace the land actually inhabited and cultivated by the settler."

The same construction was given the act of 1819 by the Commissioner of the General Land Office in his letter of instruction to the Surveyor General of Louisiana under date of August 26, 1872, as recited in the preliminary statement. In that letter he says: "The law is, in my opinion, not only clear on these points, but my interpretation of it is sustained by the usage and practice of the office from 1819 to the present time."

Assuming the soundness of this construction, it is further contended that as the claim of Philemon Chance had been completely satisfied by the survey made for him to include the actual boundaries of his settlement, the Surveyor General of Louisiana was wholly without power to issue and deliver the certificates for the unlocated balance of 640 acres, the delivery of which is sought through this proceeding.

Whilst this interpretation of the act of 1819 is supported by the long-continued practice of the executive department having control of the public lands, as well as by a decision of the Supreme Court of the United States in an analogous case (*Catholic Bishop* v. *Gibbon,* 158 U. S. 155, 167, 39 L. ed. 931, 936, 15 Sup. Ct. Rep. 779), we do not deem it our duty to pass upon it.

Since 1836 the executive department embracing the General Land Office has, in respect of the administration of all matters relating to the disposition of the public lands, the location and patenting of all private land claims, and the like, been the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States. In the Revised Statutes the same powers and duties have been confirmed and vested in the Secretary of the Interior. Rev. Stat. secs. 441, 453 (U. S. Comp. Stat. 1901, pp. 252, 257). See also sec. 2478 (U. S. Comp. Stat. 1901, p. 1586). By virtue of these provisions:

"The Secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of the public lands." *Knight* v. *United Land Asso.* 142 U. S. 161, 181, 35 L. ed. 974, 981, 12 Sup. Ct. Rep. 258; *United States ex rel. Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316, 324, 47 L. ed. 1074, 1078, 23 Sup. Ct. Rep. 698; *Catholic Bishop* v. *Gibbon, supra.*

The Secretary not only claims this supervisory power over the class of claims in controversy, by virtue of the general provisions of the statutes above referred to, but also that it is expressly recognized by the terms of the act of 1858 itself, in the 4th section which provides as follows:

"And be it further enacted, That the register of the proper land office, upon the location of such certificate, shall issue to the person entitled thereto a certificate of entry, upon which, if it shall appear to the satisfaction of the Commissioner of the General Land Office that such certificate has been fairly obtained, according to the true intent and meaning of this act, a patent shall issue as in other cases."

His construction of this section follows that disclosed in the letter of instruction of the Commissioner of the General Land Office of August 26, 1872, before referred to; and is that the words "such certificate," in the last clause thereof, refer to the land certificate by virtue of which the certificate of entry shall have been made, and not to the certificate of entry, as is contended by the relator. The ground on which this conclusion rests is that the succeeding words, "according to the true intent and meaning of this act," identify the certificate for the land, for that alone is the subject of the act; certificates of entry and actual location being provided for and regulated by other general statutes, and not at all by this. It was by reason of this interpretation of the section, as well as of the act of 1819, that the

Surveyor General, as early as August 26, 1872, had been instructed to inquire into all the necessary conditions of fact, and, when satisfied certificates for land ought to issue, to issue and then forward them to the Commissioner for approval, accompanied by the evidence upon which his conclusion was based, together with the reasons for his action. It was in obedience to this instruction, which has never been countermanded or altered, that the Surveyor General made his report, and forwarded the certificates in controversy to the Commissioner of the General Land Office for his authentication and approval.

Without regard to this particular question of construction, we are of the opinion that the issuance of land certificates under the aforesaid acts is within the supervisory power of the Secretary of the Interior in conformity with public policy as declared by Congress in the general statutes before referred to.

In declaring the general purpose of those statutes, it was said by Mr. Justice Brewer, who delivered the opinion of the court in *Catholic Bishop* v. *Gibbon,* 158 U. S. 167, 39 L. ed. 936, 15 Sup. Ct. Rep. 779): "It may be laid down as a general rule that, in the absence of some specific provision to the contrary in respect to any particular grant of public land, its administration falls wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision of the Secretary of the Interior. It is not necessary that with each grant there shall go a direction that its administration shall be under the authority of the Land Department. It falls there unless there is express direction to the contrary."

It is sufficient, therefore, to say that, under the general powers entrusted to the Secretary in respect of the administration of the public lands, we cannot hold that it was his plain duty, as a ministerial officer, to deliver the certificates to the relator for entry and location upon said lands. Being vested with the exercise of judgment and discretion in the premises, the writ of mandamus will not lie to control that exercise. *Riverside Oil Co.* v. *Hitchcock, supra.*

It follows that the judgment discharging the rule and dismissing the relator's petition must be affirmed; and it is so ordered, with costs.                    *Affirmed.*