William H. DE FORE, Mrs. P. S. Chambes, Mrs. E. C. Brown, Mrs. J. M. Peterson, M. T. DeFore, Ardell DeFore, J. H. Wimberly, Mrs. Addie W. Brown, Mrs. H. L. Symonds, Jr., and Georgia Kaolin Company, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 664.

United States District Court
M. D. Georgia, Macon Division.
June 28, 1956.

John B. Harris, Jr., of Harris, Russell, Weaver & Watkins, Macon, Ga., for plaintiffs.

Frank O. Evans, U. S. Atty., and Floyd M. Buford, Asst. U. S. Atty., Macon, Ga., for defendant.

BOOTLE, District Judge.

On February 16, 1925, W. H. DeFore and Mrs. W. H. DeFore executed a mineral lease on 237 acres of land, more or less, in Twiggs County, Georgia, for a period of 25 years, or until February 16, 1950. The lease provided for the payment of ten cents a ton royalty and a guaranteed minimum rental of $100 per year. Through a series of transfers, the Georgia Kaolin Company acquired said lease on November 29, 1937.

In 1939, fifty holes were drilled on the property by the Georgia Kaolin Company and laboratory tests as to color and grit content of the clay were then made. In April, 1940, these holes were placed upon a map or plat and the tonnage of kaolin revealed by these drillings was also placed upon said plat. These tonnages appearing on said plat dated April 24, 1940, aggregate 645,900.

In the summer or fall of 1940, the City of Macon entered into negotiations with the Georgia Kaolin Company concerning the lease of various lands owned by Georgia Kaolin Company in fee and also lands on which Georgia Kaolin Company had a mineral lease.

The DeFore mineral lease had not been mined when these negotiations commenced, but because of the location of said property in connection with the main plant of Georgia Kaolin Company and the volume and type of clay involved, this was considered a valuable leasehold by the Georgia Kaolin Company and was held as a part of its reserves.

Due to the fixed termination date of the lease and the uncertainty of the length of time of military occupancy, it became a matter of prime concern to the Georgia Kaolin Company in these negotiations to have the DeFore lease extended during the time of the occupancy of these properties for military purposes. This concern of Georgia Kaolin Company was made known to representatives of the City of Macon and to representatives of the United States for whose use these lands were being leased. Representatives of the City of Macon, but not of the Government, assured the Georgia Kaolin Company that the representatives of the City of Macon would procure an extension of the DeFore mineral lease for five years. Though bona fide efforts were made along these lines by the City of Macon and some of its citizens, such efforts proved fruitless.

By a lease dated October, 1940, the exact date being left blank, the Georgia Kaolin Company leased to the City of Macon lands which it owned in fee and leasehold interests on various properties including the DeFore tract. This was in turn subleased to the United States. This lease from Georgia Kaolin Company as extended by supplemental agreement expired by its own terms on June 30, 1946.

The individual plaintiffs, other than William H. DeFore, now deceased and who has been stricken as a party plaintiff, are the owners of the fee simple title to said lands and they leased the same to the City of Macon by lease dated January 29, 1942, which lease as extended also expired on June 30, 1946. The rights of the City of Macon under said lease were transferred to the United States. All rights acquired by the United States in and to these lands were acquired by it so that said lands might be occupied and used by it in the training of its soldiers.

Upon the termination of hostilities in the fall of 1945, the Georgia Kaolin Company began making vigorous efforts to obtain a re-entry upon the DeFore property, pointing out both to the City of Macon and to the United States that there was not much time left to run under its lease with the DeFores, which

lease was to expire on February 16, 1950. The DeFore property was not returned to Georgia Kaolin Company on June 30, 1946, the Government contending that it had not completed the decontamination of it. Georgia Kaolin Company was allowed by the United States to go upon the property in December of 1946. Stripping was commenced and continued until on or about January 28, 1947, when the equipment of Georgia Kaolin Company was required by the United States to be moved off the property. Statements were made by representatives of the United States at that time that the decontamination work done on the property had been unsatisfactory and that further efforts along these lines had to be made. In addition, it was stated by representatives of the United States that it was unsafe for men and machinery of Georgia Kaolin Company to remain on the property until this additional work was done.

At this time, Georgia Kaolin Company was faced with the decision whether to abandon the lease with the DeFores or seek an extension of the mineral lease. It chose the latter course and began negotiations with the owners of the DeFore property, who, because of the death of Mrs. W. H. Defore sometime previously, numbered nine persons.

On or about March 8, 1947, the Georgia Kaolin Company was finally allowed to go back upon the DeFore property and carry on mining operations on as full a scale as it desired.

The extension of the mineral lease with the DeFores was executed on June 18, 1947, for a period ending February 16, 1960. The terms of the extension abrogated the terms of the original mineral lease and provided a tonnage royalty at the rate of 18 cents per ton and provided for the payment of $50 per month minimum royalty for each interest outstanding; the tonnage figures to be credited against this minimum royalty. These new provisions of the lease were made effective as of July 1, 1947 and continue until February 16, 1960.

Prior to the execution of this instrument on June 18, 1947, the Georgia Kaolin Company had purchased a ⅔ undivided interest of the fee, and has sometime subsequently acquired an additional ⅓ undivided interest of the fee.

A mine was opened on the DeFore property in 1947 and tonnages of kaolin have been used continuously from said mine and are now being used from said mine under the terms and provisions of the new lease. Only 119,000 tons were mined from said property through December, 1950.

This action was instituted under an Act of Congress known as Public Law 730, Act June 19, 1948, 62 Stat. 566, conferring jurisdiction upon this Court "to hear, determine, and render monetary judgment upon the several claims (1) of the city of Macon with respect to lands owned by the city and leased by the said city to the United States for use by the Army as a part of the site of Camp Wheeler, Georgia, for damages for the breach, if any, of its leases to the United States and (2) of the owners in fee simple and the owners of leasehold interests, except the city of Macon, in and to lands leased by them to the city of Macon, Georgia and subleased by the city to the United States for such use." The Act provides further "In the determination of the claims of the owners of the fee-simple titles and of leasehold interests in lands leased by them to the city of Macon and subleased by said city to the United States, the damages allowed, if any, shall be limited to the amounts to which such owners would have been entitled under the terms and provisions of their leases to the city of Macon: Provided, That claims of fee owners and leasehold owners, excepting the city of Macon, relating to the same property shall be joined in one action and the amount of damages allowed, if any, shall not exceed the amount that could have been recovered had all the interests in such property been vested in one party. The claims of the city of Macon with respect to lands owned by it shall be determined under the terms and provisions of its leases of such lands to the United States. This Act shall be construed to waive the lack of

privity of contract between the United States and the said fee owners or between the United States and the said leasehold owners; to waive the requirement of such leases to the city of Macon of notice by the lessors to the city in order for claims of restoration to be asserted, and to waive the immunity from suit of the United States in favor of the parties and with respect to the claims described in this Act, but not otherwise to affect any rights of the parties."

In this action the plaintiffs seek damages for alleged violations of the terms of their respective leases to the City of Macon, which leases were transferred to the United States and the obligations thereof assumed by the United States. The lease provisions relied upon are as follows:

"and the Lessee, if required by the Lessor, shall, before the expiration of this lease, as the same is subject to renewal, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damage by the elements or by circumstances over which the Lessee has no control, excepted, and destruction of timber occasioned by or through range firing or through the interference through the use of which it is intended this property is to be put, also excepted". (The above is the language of the lease from the fee owners to the City, the lease from Georgia Kaolin Company to the City being the same except that therein the words "or through the interference with the use to which it is intended this property is to be put" are stricken.)

and "any and all claims for damage to the leased premises and under the terms hereof are determinable according to the value of said premises as of the date of this lease, and no such damage shall be determined upon the basis of the appreciated value of said premises occasioned by the use of and/or development upon said property or surrounding properties by the Lessee, successors, assigns or sublessees."

The fee owners seek damages for the destruction of a frame dwelling, a smokehouse, and a garage by fire, for the filling up of a well, for the removal and destruction of pecan trees other than by range firing, and for the burning and destruction during dedudding operations of 200 acres of small timber. The claims of these fee owners, however, were not tried at this time but are to be tried at a later date. We are concerned presently only with the claim of Georgia Kaolin Company and in its complaint as amended it claims no damages here except the amount of its increased potential liabilities under its new lease with which it terminated and supplanted its old one. In its original complaint it asked for certain other special damages incident to moving in and being ordered off the premises, its costs to be incurred in re-drilling and re-mapping the property and testing the clay and replacing a road. These last mentioned claims were abandoned by amendment. The original complaint laid the damages by reason of the necessity of obtaining the new lease at $53,876. The amendment which eliminated all items of damages except the $53,876 item increased that item to $185,000. At the trial, however, plaintiffs reduced that claim to $34,448 and finally to $24,759.50, explaining the final figure this way: The tonnage in the deposit is 645,000 tons, the royalty figured in the old lease was ten cents per ton, in the new lease, 18 cents. This 8 cents difference times the total estimated tonnage equals $51,672. But somewhere along the line plaintiff has purchased a ⅔ undivided interest in the fee and therefore reduces $51,672 by ⅓ leaving the figure of $34,448. The further reduction was accomplished when there was suggested during the trial the difficulty of allocating the entire $34,448 to the Government's breach of contract in view of the fact that it held over for only 8¼ months, whereas the plaintiff, by the new lease, acquired an extension of ten years

rather than an extension of only 8¼ months. Plaintiff's president thereupon testified, "We are probably saving a cent to a cent and a half a ton of this eight cents by more efficient operation. Of course that's a matter of my opinion because you don't keep your books so you can prove a figure like that to the last mill, but I do want to say to the Court that I do think we are saving a little part of that eight cents." (Transcript, page 29.) Then plaintiff multiplies 645,000, the estimated tonnage, by 1½ cents, getting $9,688.50, subtracting which from $34,448 leaves $24,759.50, the figure presently claimed.

Plaintiff's lease, as extended, expired June 30, 1946. The Government did not immediately release or return the property to the plaintiff. Plaintiff realized that it was not at liberty to resume possession and plaintiff's attorneys wrote Congressman Vinson on August 28, 1946 to ascertain from the Government "Whether it is now permissible for our client to repossess its properties, particularly what is known as the DeFore property and the Willingham-Birdsey property," reciting that the reason announced by the Camp Wheeler authorities for the delay in turning the property back to the owners is the fact that the Government desires to decontaminate the premises before the owners take possession. Under date of September 19, 1946, R. A. Wheeler, Lieutenant General, Chief of Engineers, wrote Congressman Vinson, "The Division Engineer at Atlanta, Georgia, was requested to investigate the status of negotiations for termination of the lease on the properties in which the Georgia Kaolin Company has interests and his report states that they can be released as soon as dedudding of the premises is completed, which will be on or about 20 November 1946." The original of General Wheeler's letter was forwarded by Congressman Vinson to plaintiff's attorneys on September 21, 1946. On September 30, 1946, General Wheeler again wrote Congressman Vinson that it was believed that the November 20, 1946 deadline could be met and "The War Department is ready to deliver possession to the Georgia Kaolin Company as soon as the property is in a safe condition for entry thereon."

On November 27, 1946, John W. Putnam, Acting Project Manager, delivered to plaintiff's attorneys a letter giving the plaintiff the right of immediate entry for use and occupancy of the leased premises, but containing a clause as follows: "In consideration of this right of immediate entry, Georgia Kaolin Company does hereby release the United States from all claims and liability for restoration or damage, provided, however, that it is expressly understood that this waiver does not include or affect any and all damage or claims which might have arisen prior to this date on account of the occupancy of the United States." Plaintiff's attorneys protested as to the release clause and, on December 5, 1946, John W. Putnam wrote plaintiff's attorneys as follows:

"The office of the District Engineer, Savannah, Georgia has advised this office by letter, dated 3 December 1946, that decontamination of Camp Wheeler is 100 per cent complete.

"This office will interpose no objection to the revision of the release clause, whereby no waiver is given by the Georgia Kaolin Company for any possible claim which might arise by reason of a bursting shell, bomb or any other like explosive."

On December 7, 1946, plaintiff's attorneys wrote Mr. Putnam that plaintiff would re-enter on December 10, 1946, and asked for reassurance that the decontamination was complete. On December 9, 1946, Mr. Putnam replied as follows:

"It is believed that all ammunition and explosives on the property have been located and rendered harmless. In the event that duds, bombs, mines or any other type of explosives are found on the premises at any time it is requested that this office be promptly notified. Upon receipt of such notice action will be taken to dispatch experienced personnel to

the property for the purpose of destroying or making the explosive harmless. No attempt should be made to move or otherwise disturb the explosive."

On December 24, 1946, plaintiff's attorneys wrote Mr. Putnam that a dud had been found and asked him to have someone "take charge of this matter." On December 30, 1946, Mr. Putnam wrote plaintiff's attorneys as follows:

"This will acknowledge your letter of December 24, 1946 regarding discovery of a dud on the DeFore property. As advised in telephone conversation of December 27, 1946, this office has been informed that certain areas at Camp Wheeler have not yet been approved as to decontamination, although completion had been reported. Portions of Tracts 113, 163 and 166 are involved in areas not yet certified and, accordingly, the Georgia Kaolin Company should be cautioned against the use and occupancy of said tracts until further notice.

"This office has been informed that a team will work said tracts between the 1st and 15th of January, 1947, and you will be advised upon the clearance of said tracts at the earliest practicable date."

On February 6, 1947, plaintiff's attorneys wrote Congressman Vinson as follows:

"The first part of this week, after we had started mining the DeFore property, we were informed by the authorities at Camp Wheeler that this property and adjoining property covered by the same lease were unsafe for mining, had not been decontaminated, and that we should immediately remove our men and equipment from the land. We were further advised by Mr. Miller, who seems to be in charge at Camp Wheeler, that this land, as well as the other land covered by the lease of Georgia Kaolin Company to the City, could never be made safe for mining purposes."

Plaintiff had stripped overburden from the property from December 27, 1946 to January 28, 1947, when it moved off the property and discontinued operations thereon. It moved off because, on January 24, 1947, Mr. Mann, who appeared to be in charge at Camp Wheeler, explained to Mr. David Lewis, plaintiff's assistant to vice-president, that the work toward decontamination that had been done was unsatisfactory, and that they were going to have to burn the property again and search for duds, that plaintiff would have to have its men out of there and also its equipment. Mr. Lewis considered that information "as ordering us off."

On February 5, 1947, Mr. Lewis, at Camp Wheeler, talked with Safety Engineer Miller and Custodian Mann. Mr. Miller advised that on the Willingham property they still found a lot of duds and that they were going to have that area and one other area on the corner of the DeFore property burned over and after it was burned over they were going to have another search made for duds and that it was his (Miller's) opinion that the tract never would be safe for the reason that there were duds sunk in the ground as deep as three feet and while he had found some of these he had no way of knowing if he was able to get them all.

On February 11, 1947, Mr. Gordon Britton, Division Real Estate Officer, Office of the Division Engineer, Atlanta, Georgia, wrote plaintiff's attorneys that approximately one acre of land in the extreme southwest corner of Tract 163 was shown on the map as being within the contaminated area and that this area was set aside as a safety zone; that a map showing the exact boundaries for the restricted area was being reproduced and would be furnished the addressee within a few days; that the Custodial Officer at Camp Wheeler was being furnished copy of this letter with appropriate instructions, and that "This office hopes that this information will clear up any doubt as to whether or not Tracts 163 and 166 are

safe for mining and that you will proceed with your activities."

On March 5, 1947, Capt. Wagner, Mr. Putnam, a Mr. Mason and others conferred with plaintiff's counsel, at which time Capt. Wagner stated that he would see Mr. David Lewis, go over the property with him and inform him whether it was safe for plaintiff to proceed with its mining operations. Capt. Wagner told Mr. Lewis that the property was free for mining operations, but stated that plaintiff "must be cautious." Capt. Wagner stated during the conference that the map which had been furnished plaintiff showing unsafe areas was not correct.

On March 17, 1947, Mr. B. A. McKinley, Administrative Officer, Chief, Management and Disposal Branch, Real Estate Division, Mr. John W. Putnam, Mr. Gilbert H. Gulley, Bomb Disposal Technician, Corps of Engineers, conferred with Mr. David Lewis and plaintiff's counsel and, under date of March 18, 1947, Mr. McKinley wrote plaintiff's counsel advising that dedudding had been completed, that all approved and known methods of search and demolition had been utilized and every reasonable precaution taken to remove all unexploded shells from the area, that to the best of his knowledge and belief the reservation was free and clear of unexploded missiles with one exception; namely, that he was not able to certify that there were no explosives beneath the surface of that part of the hill in the Bartow Range, which was used as the impact area for the 105's and heavy mortar, that in connection with that area flags would be staked out encircling the doubtful area, that the District Engineer at Savannah would be requested to proceed with a metes and bounds survey of the area and that the flags would be placed in company with a representative of plaintiff.

The stripping operations were resumed on March 18, 1947.

From the foregoing, I find that the Government breached its implied obligation to yield and deliver up the possession of the leased premises at the expiration of the lease. 32 Am.Jur. Sec. 841, page 716.

Now arises the question, to what damages, if any, is plaintiff entitled by reason of this breach? The plaintiff says that this is a breach of contract case and that it is entitled to damages as ascertained and awarded in such cases. The Government says that plaintiff is entitled to nothing because: (1) the Government became a tenant at will after June 30, 1946; (2) the damages claimed were not within the contemplation of the parties when the lease was made; (3) at most, the rental or market value of the premises held over by the tenant is the measure of damages applied in landlord and tenant cases; (4) the rule applicable in eminent domain cases for determination of value of the part of the lease taken should be applied; (5) the Government is not bound by the acts of Miller and Mann in ordering plaintiff off the property, if they did order plaintiff off, and (6) this Court does not have jurisdiction of this claim.

As above indicated, this Court rejects the Government's contention that it was a tenant at will and finds and holds that it was wrongfully in possession after June 30, 1946. 32 Am.Jur. Sec. 918, page 778.

This Court likewise rejects the Government's contention that it is not bound by the acts of Miller and Mann in virtually ordering plaintiff off the premises. In the first place, under the terms of the lease with the implied promise to surrender and yield up possession the implied promise was breached immediately after June 30, 1946 by the acts of the Government in withholding possession after that date and refusing plaintiff permission to re-enter. Under the correspondence fully set out and referred to above, plaintiff was wrongfully kept out of its leasehold interest from June 30, 1946 to December 27, 1946 and after it remained in possession for approximately one month from December 27, 1946 until January 23, 1947 it was virtually ordered off of the premises on the last mentioned date and complied with such order on

January 28, 1947, and was not permitted to re-enter until March 18, 1947. Whether or not Miller and Mann as an abstract proposition had the authority to order plaintiff off of the premises on January 23, 1947, this Court finds that in doing so they were doing exactly what their superiors wanted done and that these superiors ratified their action as is evidenced by the correspondence above set forth and by the conferences held between such superiors and plaintiff's attorneys as reflected in said correspondence and above mentioned. This Court also rejects the Government's contention that it does not have jurisdiction of this action under the terms of the special Act of Congress above cited.

This Court adopts the plaintiff's contention that this is a breach of contract case and must be decided accordingly. This Court cannot agree with plaintiff, however, in its contention that such damages as it here claims (or such as it would claim the right to claim, but for the new lease) were within the contemplation of the parties, or either of them, when this lease was signed.

"It is true that, as people when contracting contemplate performance, not breach, they commonly say little or nothing as to what shall happen in the latter event, and the common rules have been worked out by common sense, which has established what the parties probably would have said if they had spoken about the matter. * * * We have to consider, therefore, what the plaintiff would have been entitled to recover in that case, and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

"This point of view is taken by implication in the rule that 'a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract.' * * * The consequences must be contemplated at the time of the making of the contract." Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 543, 23 S.Ct. 754, 755, 47 L.Ed. 1171, 1173.

Never once in the negotiations for this lease did plaintiff intimate or suggest that it could, or would, seek to hold the Government responsible for loss of prospective profits or for the costs of obtaining a lease extension. To be sure, it emphasized the importance of the lease to itself and the shortness of the lease term and its desire for an extension, but it was content to rely upon the citizens of Macon for their assistance in obtaining the desired extension. Moreover, the plaintiff knew that the Government knew that plaintiff so relied. Plaintiff's president, in describing the lease negotiations, in Washington, with General Ribault, the Chief of Engineers of the U. S. Army, said:

"And I talked about the DeFore lease and Mr. Chestney (an interested citizen of Macon) mentioned that they felt certain they could get the lease extended for whatever period the Government wanted it. I told them that I felt that the people of Macon who were going to benefit by this also should be patriotic enough to extend the lease the same period without charging us any more. I thought that was just equity. Of course, equity don't work in these things, I found that out, but that's the way I felt. The General said, 'Well, they say they are going to get it for you. Why do you want to put all of these things in the lease?' "

Here the parties were in 1940 negotiating a lease for a leasehold interest, in effect a suspension of plaintiff's rights under its mineral lease, which in all probability would have to continue throughout the uncertain and unpredictable period of hostilities. To that end the Government desired a 25-year term which would have carried it some 15 years beyond the expiration date of plaintiff's

lease from the DeFores. It was reduced to a 5-year term. There was at least a strong possibility that this shortened term would have to be extended beyond the expiration date of the mining lease itself, February 16, 1950, and yet the plaintiff, and be it said to plaintiff's credit, was content, for civic and patriotic purposes, to rely upon assurances of reputable citizens of Macon that they would, on plaintiff's behalf, obtain an extension. To read into this lease a contemplation by the parties of a liability on the part of the Government for damages of the type here claimed would be inconsistent with the careful provisions the parties took pains to make limiting the Government's liability for failure to restore physical properties. By the lease, the physical properties, described as "the premises", were to be restored, upon demand of lessor, to the same condition as at the time of the lease excepting reasonable and ordinary wear and tear and damages by the elements, or by circumstances over which the lessee had no control and destruction of timber by range firing. Witness further the provisions that "Any and all claims for damage to the leased premises and under the terms hereof are determinable according to the value of said premises as of the date of this lease. * * *" This careful guarding and limiting of the lessee's liability with respect to physical properties is hardly consistent with the contemplation by either party that the lessee was incurring an unlimited liability for such damages as might result from the expiration of a lease covering an unopened mine, or from lost profits from the operation of such a mine.

 I agree with the Government's contention that at most in this case the plaintiff is entitled to recover only the reasonable rental value of the leased leasehold interest for the time it retained possession. 32 Am.Jur. Sec. 927, page 783. And in this connection, the burden rests upon the plaintiff to establish by a preponderance of the evidence both that it has sustained damages and the amount thereof.

Earlier herein there has been set forth the mathematical computations by which the plaintiff arrived at its presently claimed figure of $24,759.50. The problem here, however, is more than mathematical. The difficulty in determining whether plaintiff has been damaged at all, and, if so, to what extent, is pointed up by the fact, as the evidence shows, that the value of a relatively short term mining lease drops precipitously when it is shortened, other than by operations, and by the same token skyrockets when it is lengthened. Plaintiff's president testified that the loss of $8\frac{1}{4}$ months from its lease which had three years seven months and sixteen days to run before the loss might have cost "as high as one hundred thousand dollars" in higher operational cost, transcript page 34; that the loss of $8\frac{1}{4}$ months from this $43\frac{1}{2}$ month lease might make it worth only half as much, transcript page 109; that as of October, 1940, the $43\frac{1}{2}$ month lease was probably worth $100,000, whereas the same lease with only $8\frac{1}{4}$ months subtracted from it would be worth perhaps only one-half as much, or $50,000. Transcript, pages 103, 109.

While the plaintiff probably could have mined the entire 645,000 tons during the $43\frac{1}{2}$ months available to it under its lease had there been no holding over by the Government, it is clear, under the evidence, that it could not have done so as advantageously economically and moneywise as it can under its new ten-year lease expiring February 16, 1960. The plaintiff did not need the clay on this deposit except to augment its reserves. It had been holding this deposit in reserve since November 29, 1937. It had not mined it because it did not need it. Transcript, page 65. It tries to keep a 40-year reserve. Transcript, page 66. It can make more money using this deposit leisurely and blending a little of it along and along with clays from other deposits. Transcript, pages 38, 65 and 71. The danger of shipping something that is too good is almost as great as shipping something that is poor. Transcript, page 71. Consequently, although plaintiff was in complete and undisturbed possession ever

since March 18, 1947 it shipped from this property through the end of 1955 only 119,000 tons. Transcript, page 28. The plaintiff's president testified: "We are mining where it is most advantageous and under methods which are more efficient to us." Transcript, page 28. The lease extension of ten years rather than 8¼ months also permitted plaintiff to absorb its higher cost properties for tax purposes. Transcript, page 29.

When the Government breached the contract it became plaintiff's duty to minimize its damages. Georgia Code, § 20-1410; 15 Am.Jur. Section 30, pages 426 and 427. The plaintiff recognized this obligation and did so.

It is impossible for the Court to find that plaintiff's damages, if any, have not been minimized to the vanishing point so that as a net result of the Government's breach and the plaintiff's minimization the plaintiff is now in a better position financially than it was immediately prior to the breach. Even if it could be said that some damages remain not entirely minimized by the new contract, the plaintiff has produced no evidence which would authorize a finding as to the amount of such damages. Damages which are remote, uncertain, conjectural or speculative in their nature will not afford the basis of a recovery. D. A. Tompkins Co. v. Monticello Cotton Oil Co., C.C., 153 F. 817; United States v. Huff, 5 Cir., 175 F.2d 678, 679, 680. In the Huff case, the Court said:

"While it may be inviting to approve the trial court's findings and allow at least a partial recovery for such losses, it remains our solemn duty under this evidence to disallow these unproved claims, as it is well settled that speculative damages are not recoverable. It was incumbent upon these plaintiffs to adduce some clear and convincing proof of *specific losses resulting solely* from the Government's failure to repair and maintain the fences, and this they have signally failed to do." (Italics supplied.)

The burden here was upon the plaintiff to adduce clear and convincing proof "of specific losses resulting solely from the Government's failure" to surrender possession. Assuming that the $24,759.-50 of potential royalty payments here claimed will eventually be made that figure represents the cost of the 10-year extension rather than of an 8¼ month extension and there was no obligation on the Government to procure a 10-year extension. No evidence has been adduced showing what the cost of an 8¼-month extension would have been. The plaintiff made no effort to obtain an extension of only 8¼ months and plaintiff's president, of course, has no idea what such an extension would have cost. Transcript, page 98.

I have reached these conclusions notwithstanding my inclination to assume that all of this clay deposit will be mined within the period of the new lease, but that is by no means a certainty. As Judge Conger said in the companion case in this Court, Georgia Kaolin Company v. United States of America, Civil Action No. 661, affirmed 5 Cir., 214 F.2d 284: "The question of whether or not the holder of the lease would mine the clay and pay the royalties would depend upon the condition of the market, the uncertainty of the future, the demand for the product, and many other elements, on and on, in the future."

I conclude, therefore, that the plaintiff, Georgia Kaolin Company, is entitled to recover of the defendant, the United States of America, only nominal damages in the sum of $1.

Let the parties prepare and submit a form of final judgment for entry by the Court in conformity with the findings of fact and conclusions of law set forth herein.

Were we to measure plaintiff's claim by the general principles applicable in condemnation cases, as the Government says we should and the plaintiff says we should not, and as was done in the companion case above mentioned, the result would be the same. There was no market value for the 8¼-month excerpt from

plaintiff's lease and therefore we would have to seek and apply some yardstick other than market value, United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311, 319, and the law provides no more appropriate substitute measure than that contended for by plaintiff in this case and applied herein.