The PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 86–523.

United States Court of Appeals,
Federal Circuit.

Aug. 29, 1986.

Thomas H. Adolph, Baker and Botts, Houston, Tex., argued for appellant. With him on the brief was F. Walter Conrad, Dallas, Tex.

Martin W. Matzen, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were F. Henry Habicht, II, Asst. Atty. Gen., Silvia Sepulveda-Hambor and John T. Stahr, Washington, D.C., Howard L. Hardegree, Gen. Services Admin., Fort Worth, Tex., of counsel.

Before RICH, Circuit Judge, NICHOLS, Senior Circuit Judge, and ARCHER, Circuit Judge.

ARCHER, Circuit Judge.

The Prudential Insurance Company of America (Prudential) appeals from the United States Claims Court's partial grant of summary judgment [1] for the government in *The Prudential Insurance Company of America v. United States,* 7 Cl.Ct. 710 (1985), holding that, as a matter of law, Prudential was not entitled to special or consequential contract damages incurred

---

1. The remaining issues were settled and judgment entered accordingly, see *infra* n. 4.

as a result of the government's holdover in its leasehold. We affirm.

## Background

A full and complete exposition of the uncontroverted facts may be found in the Claims Court opinion. Summarily, the government had entered into a fixed-term lease for office space in the Pinehollow Building in Houston, Texas. Shortly after the lease commenced, Prudential purchased the Pinehollow Building from the lessor, Diversified Building Equities, Inc. and retained Diversified to manage the building. The lease agreement afforded the government the option to extend the lease for a fixed period, which the government timely exercised. Either party then had the option to terminate the lease at any time during the extension period effective ninety days after giving notice.[2] Prudential exercised this option and the lease was terminated effective June 27, 1979. The government did not vacate its Pinehollow space on June 27, but instead held over as a tenant-at-sufferance until April 15, 1980.

Prudential, on several occasions[3] after June 27, 1979, demanded that the government vacate its Pinehollow space. Through these communications the government was placed on notice that: (1) Prudential was negotiating a new lease with one of its tenants; (2) this new lease would include the space occupied by the government; and (3) Prudential could suffer considerable damages if the government did not vacate the space. Prudential executed the new lease with its tenant, Cities Service

Company, on November 30, 1979. It covered existing space occupied by Cities Service as well as additional space in the Pinehollow building, including the government-occupied space. The new lease agreement also gave Cities Service the option to cancel its entire lease if it could not occupy the space encumbered by the government by February 1, 1980. Cities Service, on March 2, 1980, terminated its entire lease with Prudential because the government-occupied space was not available to Cities Service by the required date of February 1, 1980.

Prudential brought suit against the government in the United States Claims Court for $814,723 in special or consequential damages.[4] This amount included sums for: (i) net loss of rental revenue from the Cities Service space; (ii) real estate commissions incurred in obtaining the new tenants; (iii) refurbishing expenses related to the new tenants; and (iv) increased operating expenses related to the new tenants. Prudential also sought recovery of $35,000 for attorney fees.

## Claims Court Opinion

The Claims Court, mindful of its jurisdiction under 28 U.S.C. § 1491(a)(1) (1982),[5] determined that there was no express provision in the contract requiring the government to vacate at the end of the lease term and that an implied in fact contract had not been established by Prudential. The court then held as a matter of law that an implied covenant to vacate cannot be read

---

**2.** Clause 13 of the lease provided:

Either party may terminate this lease during renewal period by giving at least 90 days' notice in writing to the other party, and no rental shall accrue after the effective date of such termination.

**3.** July 17, 1979; August 14, 1979; and November 6, 1979.

**4.** The suit included a claim for the net fair rental value of the use of space in the Pinehollow building during the government's holdover of occupancy under a taking theory. The court concluded that the government was liable but that the amount of the fair rental value was in

dispute, and thus not a proper matter for summary judgment. The amount of the fair rental value was thereafter stipulated and agreed upon by the parties and judgment was entered accordingly.

**5.** Section § 1491(a)(1) states, in pertinent part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

into a fixed-term lease agreement where the government is the lessee. *Prudential Insurance*, 7 Cl.Ct. 714–15.

The court further held that even if a covenant to vacate the Pinehollow space could be imputed against the government under the lease agreement, the government would not be liable for the special or consequential damages claimed by Prudential. *Id.* at 717–18. In reaching this conclusion, it adopted the general rule of contract law that a tenant is only liable for special or consequential damages if they were foreseeable at the time the lease was executed. *Id.* at 716–18. Under the circumstances presented, the court concluded that it was not foreseeable at the time the government executed its lease that the lessor would be damaged, as a result of the government's holdover, by the loss of another Pinehollow lessee occupying leased space far in excess of that occupied by the government, or that the lessor would be damaged by having to subdivide the other lessee's space to accommodate a plurality of new tenants.

### ISSUES

Prudential has appealed both rulings of the Claims Court and we are called upon to decide:

a. whether the Claims Court erred in holding that the government is not obligated under a fixed term lease to vacate the premises at the end of the term in the absence of an express or implied in fact covenant requiring it to do so; and

b. whether, assuming the government breached an obligation to vacate, the Claims Court erred in concluding that the government would not be liable for special or consequential damage sought by Prudential.

### OPINION

A. Prudential contends in this appeal, as it did before the Claims Court, that a lease for a fixed term obligates the lessee to vacate at the end of that term. It says the obligation is implicit or inherent in the

landlord-tenant relationship under such a lease. Thus, at the beginning the landlord is obligated to deliver possession of the premises to the lessee and, by the same token, at the end of the term the lessee is obligated to deliver up possession. This argument is based on construction of the express terms of the lease agreement, and not on additional or implied in fact agreements established through parol or other evidence.

The Claims Court, however, focused its opinion in large measure on the necessity of Prudential showing the existence of an implied in fact agreement separate and distinct from the lease agreement, in order to recover. It first noted that the Pinehollow lease contained no express covenant requiring the government to vacate at the end of the lease term; that the common law remedies for monetary compensation—trespass, assumpsit or unlawful detainer—available to a landlord against a holdover tenant were actions sounding in tort and did not fall within the court's jurisdictional umbrella provided by the Tucker Act;[6] and that state law damage provisions for holdover were not applicable to the federal government. To establish an implied in fact covenant requiring the government to vacate at the end of the term, the Claims Court, relying on *Goodyear Co. v. U.S.*, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575 (1928) and *H.F. Allen Orchards v. U.S.*, 749 F.2d 1571 (Fed.Cir.1984), ruled that there must be the same mutuality of intent as in the case of an express covenant.

A contract implied in fact is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties. However, all of the elements of an express contract must be shown by the facts or circumstances surrounding the transaction—mutuality of intent, offer and acceptance, authority to contract—so that it is reasonable, or even necessary, for the court to assume that the parties intended to be bound.

6. 28 U.S.C. § 1491(a)(1).

The Claims Court found Prudential set forth "no facts either in the lease itself or in the circumstances surrounding its execution which would indicate such mutual intent here." Since an implied in fact covenant is not the theory of the case put forth by Prudential, it is not surprising that such facts are missing.

We are required to deal here only with the express terms of the Pinehollow lease and determine, as a matter of law, whether they may properly be construed to impose on the lessee an implicit obligation or covenant to return possession of the premises to the lessor at the end of the lease period, and whether a failure to do so constitutes a breach of the lease agreement. *Cf. United States v. Bostwick*, 4 Otto 53, 94 U.S. 53, 66, 24 L.Ed. 65 (1876).

B. It is well settled that contracts to which the government is a party—and though a lease may concern and convey a property interest it is also very much a contract—are normally governed by federal law, not by the law of the state where they are made or performed. *United States v. County of Allegheny*, 322 U.S. 174, 183, 64 S.Ct. 908, 913–14, 88 L.Ed. 1209 (1944); *Forman v. United States*, 767 F.2d 875, 879 (Fed.Cir.1985); *Keydata Corp. v. United States*, 205 Ct.Cl. 467, 482, 504 F.2d 1115 (1974); *cf. George S. Groves v. United States*, 202 Ct.Cl. 660, 674 (1973). Leases are not sufficiently different from other federal contracts to call for an independent set of analytical principles and rules, *cf. Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Forman*, 767 F.2d at 879; *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), particularly when there is no question about the nature of the property interest transferred, but merely a question of the lessee's obligations under the lease agreement. *Keydata Corp.*, 205 Ct.Cl. at 482. To the extent existing federal law is not determinative of the issue and permits an area of choice between the merits of competing principles, the best in modern decision and discussion, including the general principles of contract and landlord-tenant law, should be taken into account. *Priebe*

*& Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 125–26, 92 L.Ed. 32 (1947); *National Metropolitan Bank v. United States*, 323 U.S. 454, 456, 65 S.Ct. 354, 355, 89 L.Ed. 383 (1945); *Keydata Corp.*, 205 Ct.Cl. at 480.

A general rule of landlord-tenant law, as applied between private parties, is that the expiration or termination of a lease agreement terminates all rights of the lessee in the premises, and it becomes the lessee's duty to surrender possession of the leasehold to the lessor. 49 AM.JUR.2D *Landlord and Tenant* § 1013 (1970); RESTATEMENT (SECOND) OF PROPERTY § 14.6, Reporter's Note to Section 14.6, Note 2 (1977) (in making a lease, the tenant has contracted, in effect, to surrender the premises upon the termination of the lease—by holding over the tenant has breached the lease). It is a covenant, either express or implied, of all leases for a definite term that the lessee will vacate the leasehold at the expiration or termination of the lease. *Catholic Bishop of Nesqually v. Gibbon*, 158 U.S. 155, 170, 15 S.Ct. 779, 785, 39 L.Ed. 931 (1985); 49 AM. JUR.2D § 1013.

One federal circuit court has recognized an implied obligation running against the government as a lessee to vacate its leasehold at the expiration of its lease. *Georgia Kaolin Co. v. United States*, 249 F.2d 148, 149 (5th Cir.1957), *aff'g De Fore v. United States*, 145 F.Supp. 484, 490 (M.D.Ga.1956). Another federal circuit court has implicitly recognized the inherent obligation to vacate against a lessee, albeit between private parties, *Atlantic Richfield Co. v. Zarb*, 532 F.2d 1363, 1365 and n. 1 (Temp. Emer.Ct.App.1976). Numerous state courts have also noted this obligation. *See, e.g.*, 49 AM.JUR.2D § 1013, 986 n. 1 (cases cited therein); RESTATEMENT (SECOND) OF PROPERTY, Reporter's Notes to Section 14.6, Note 1 (cases cited therein).

The above-referenced authorities provide ample support for the conclusion that there is an implied contractual obligation running against a lessee to vacate a leasehold upon

the expiration or termination of a lease.[7] Moreover, the proposition has logic behind it and is consistent with other principles of law. A lessor, under a fixed term lease, temporarily relinquishes to the lessee the limited, but exclusive, right to use the property for a predetermined period. The temporary nature of the transfer is founded upon the understanding of the parties that possession will be delivered up to the lessee at the commencement of the lease, and that upon expiration of the lease the lessee's limited rights in the property will terminate and the full rights in the property, including possession, will revert to the lessor. There is ample authority that there is an implied contractual obligation to provide the lessee with possession at the beginning of the lease term. *See* 96 A.L.R.3d 1155; 49 AM.JUR.2D §§ 216, 221; RESTATEMENT (SECOND) OF PROPERTY §§ 412, 512. Although the cases for the obverse are fewer, this may be attributable to the greater ease and efficacy in obtaining non-contractual relief as a result of holding over.[8]

As a matter of contract interpretation, the decision of the Claims Court has the anomalous effect of voiding an express provision of the lease. By holding as a matter of law that an implied covenant to vacate cannot be read into a fixed term lease agreement, the ending date on which the lease expires or terminates is correlatively read out of the agreement and made meaningless. Such a construction defies logic and precedent for interpreting contracts. *Petrofsky d/b/a Petrof Trading Co. v. United States*, 222 Ct.Cl. 450, 616 F.2d 494 (1980).

The Claims Court recognized in its opinion that a variety of common law writs are available to the landlord for ejecting, or securing damages from, a holdover tenant.

All of these are based on tortious conduct—unlawful or unauthorized deprivation of property—a precondition of which is that the tenant has no contractual or other legal right to retain possession or occupancy of the leased premises beyond the lease term. These actions thus assume that an obligation to vacate at the expiration date of a lease is inherent, if not expressly stated, in the lease agreement.

Part of the reasoning of the Claims Court which influenced its decision was that if a covenant to vacate could be implied by the mere fact that the lease was granted for a limited term, an express covenant to vacate would be redundant or superfluous. Lease agreements today routinely spell out in great detail the lessee's obligations, including specific provisions relating to vacating the premises. Among other reasons for doing so, the landlord usually is seeking to obviate the need for judicial proceedings, to provide more specifically the lessee's duties in vacating, and to provide for liquidated damages for failing to vacate promptly. None of these renders an implied covenant nugatory; they supplement and enforce the implicit requirement of a fixed term lease to vacate on the termination date.

■ We conclude that, due to definite term of the lease and the nature of the landlord-tenant relationship, an implied duty to vacate is an inherent part of every fixed term lease agreement unless the parties explicitly express an intention to the contrary.[9] General support for such a conclusion is found in the Supreme Court's opinion in *United States v. Bostwick*, 4 Otto 53, 94 U.S. 53, 24 L.Ed. 65 (1876). The *Bostwick* Court stated that:

> the holdover tenant, but only the proximate result of the holding over.
> Compare *infra* Part C.

---

7. Unlawful or unauthorized deprivation of property by a holdover tenant also constitutes tortious conduct. *See infra* note 8 and text following.

8. RESTATEMENT (SECOND) OF PROPERTY, Reporters Notes to Section 14.6, Note 4, states: The other view is that holding over is a tort, damages for which need not be foreseeable by

9. Our review of the record does not reveal any express intention to exclude such an implied obligation from the Pinehollow lease agreement.

in every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not to unnecessarily injure it.... This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates.

Just as a requirement of proper use flows from the landlord-tenant relationship, a requirement to vacate flows from a lease containing a fixed term or a definite termination date.

Having determined that the Pinehollow lease agreement impliedly required the government to vacate at the end of the lease term (as extended by the renewal period),[10] it follows *ipso jure* that the government breached the lease agreement by holding over from June 27, 1979 to April 15, 1980.

■ C. In view of our conclusion that there was a contractual obligation to vacate, we must address the Claims Court's alternative basis for granting partial summary judgment. In doing so, we must determine whether there was a material issue of fact with respect to the foreseeability of the claimed special or consequential damages.[11] Prior to our review of this facet of the case, however, we must resolve the question as to the appropriate point-of-time[12] against which foreseeability is measured.

■ Our predecessor court, the Court of Claims, has stated that foreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made. *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 714–15 (1975) (see cases cited therein at pp. 720–21). As between private parties, the Supreme Court has recognized that the party who breaches a contract can only be held responsible for such consequences as may be reasonably supposed to be within the contemplation of the parties at the time the contract was made. *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 755–56, 47 L.Ed. 1171 (1902). The general rule for consequential damages in property law is similarly that they must be foreseeable by the tenant/lessee at the time the lease is executed. RESTATEMENT (SECOND) OF PROPERTY § 14.6, Reporter's Note to Section 14.6, Note 4 (1977). The RESTATEMENT has, however, modified the general rule by making the holdover tenant liable for those damages which were foreseeable at the time the lease agreement was breached. *Id.* We conclude that the better rule, and the one that is applicable as federal law in interpreting a government contract, *County of Allegheny*, 322 U.S. at 183, 64 S.Ct. at 913–14, is that, for damages to be recoverable as consequential or special, they must be foreseeable by the tenant at the time the lease agreement is executed.[13]

---

**10.** A necessary consequence of this conclusion is that the Claims Court had jurisdiction based upon an express contract, the Pinehollow lease agreement. 28 U.S.C. § 1491(a)(1) (1982).

**11.** Prudential has argued on appeal that the Claims Court did not apply the summary judgment standard enunciated by this court in *Lemelson v. TRW, Inc.*, 760 F.2d 1254 (Fed.Cir. 1985), because it engaged in fact-finding, made improper inferences, and resolved doubts in favor of the government.

The determination as to whether the duty to vacate is an obligation which may be implied in a lease agreement is a question of law, and is reviewed as such. Likewise, the point-of-time from which foreseeability is measured, discussed *infra*, is a question of law.

**12.** The Claims Court concluded that foreseeability of special or consequential damages is determined as of the time the contract was executed. Prudential argues on appeal that foreseeability should be measured at the time the lease agreement is breached.

**13.** Although this may place a more difficult burden on a lessor seeking consequential damages against the government as a holdover tenant, lessors may have an alternate avenue of relief under the Takings Clause of the Fifth Amendment. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1959); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

The Claims Court noted that, at the time the Pinehollow lease agreement was executed in 1973, it was not foreseeable by the government that, if and when it held over, it would cause the landlord to be damaged not only by the loss of a tenant for the leased property but also by the loss of a lease for other property in excess of that occupied by the government, and by having to subdivide that other property for new tenants. We cannot say that the court erred in holding that Prudential's claimed consequential damages were too remote and speculative, i.e., not natural and probable consequences flowing from the government's holdover. *Northern Helex Co.*, 524 F.2d at 720.

Prudential argues that resolution of the foreseeability issue was premature, that there was no direct evidence on the issue of foreseeability, and that the Claims Court improperly engaged in speculation and ignored evidence favoring Prudential's position. Prudential asserts that any delay in the availability of space can cause damage to a landlord in the form of a lost lease, lost profits, or liability to a new tenant for delay and that, in the context of modern commercial leasing practice, it is foreseeable that a holdover tenant may cause the landlord to lose an opportunity to lease a space which is smaller than, equal to, or larger than the leased space. We find these arguments singularly unpersuasive and insufficient to show the existence of a material issue of fact.

The uncontroverted evidence of record shows that Prudential exercised its option to terminate its lease with the government on March 27, 1979. And while the record does not indicate with precision the exact date on which Prudential started negotiations with Cities Service for a new lease, the most favorable inference is that they began immediately following Prudential's exercise of its termination option. With this timing, Prudential has failed to show that a material issue of fact existed concerning the government's ability to foresee Prudential's dealings with Cities Service or any other tenant occupying such a large part of the Pinehollow Building at the date

of execution of its lease in 1973. Prudential has not pointed to any evidence of record to show that such factual concerns, relevant to a real or prospective client, were communicated to the government at that time. General statements as to lost leases, lost profits, or liability to new tenants for delay in occupying a leasehold are merely conclusory and speculative in nature and are insufficient to withstand a motion for summary judgment. The party opposing summary judgment must show an evidentiary conflict on the record by a counter statement of facts or facts set forth in detail by a knowledgeable affiant. Mere denials or conclusory statements are insufficient. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984).

While modern commercial leasing practices may have relevance in establishing the foreseeability of consequential damages, allusions to modern commercial leasing practices in the abstract are wholly insufficient to demonstrate a genuine issue of material fact. Rule 56(f) of the Rules of the United States Claims Court (corresponding to Rule 56(e), Fed.R.Civ.P.) provides in pertinent part that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations and denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Prudential did not set forth any specific facts showing what its, or other companies', commercial leasing practices were, nor did it present any evidence to show that these practices were communicated, or known, to the agents of the government at the time the Pinehollow lease was executed. In the absence of any showing of a genuine issue of material fact, we are unable to say it was improper for the Claims

Court to grant the government's motion for partial summary judgment.

As modified, we affirm the decision of the Claims Court.

AFFIRMED.

NICHOLS, Senior Circuit Judge, concurring.

I join in Judge Archer's able opinion, but desire to add a few words respecting my own problems with the resolution of this case which, by the authorities, we are constrained to arrive at. Were we writing on a clean slate, I would prefer to make Prudential whole for the losses it has suffered because the government, by holding over its leasehold term, prevented it from performing its contract with Cities Service.

The opinion properly relies on *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) in which I dissented at 726, and cases cited therein. Perhaps a realistic assessment of the situation is the Holmesian doctrine that a contracting party who breaches a contract not enforceable in equity, or under tort law, really enjoys an option to withhold performance on payment of some anticipated money equivalent of what is withheld. *Oliver Wendell Holmes, The Common Law* (Howe Ed.1963) 236. Thus he cannot realistically be said to act illegally. The established doctrine in government contract law goes back to a case cited and quoted in *Northern Helex: Myerle v. United States*, 33 Ct.Cl. 1 (1897), an opinion by Davis, *J.*, one of the ablest of that Nineteenth Century court.

Myerle's decedent, Phineas Burgess, a New York shipbuilder, was induced by the Navy Department to establish a shipyard at Sausolito, California, in 1876 where he contracted to perform work ostensibly in repair of a U.S. warship, the *Monadnock*, but really to build a new one of that name. The work progressed slowly until 1878, and was thereafter suspended for lack of funding until 1883 with the new *Monadnock* still on the stocks in Burgess' shipyard, blocking his acceptance of other work.

The case is a compendium of about all the breaches of a shipbuilding contract it is possible for the Navy Department to commit: defective plans, defective government-furnished material, long delays in payment, etc., with the further complication that Congress took the view the contracts were illegal, a position the court rejected. The court had to, and did, override other vigorous resistance to awarding anything, but the actual award of $129,811.43 (without interest for 20 years' delay in payment), was grossly insufficient to place the contractor in as good a position as he would have enjoyed if the government had performed, because of a rule made perfectly clear:

We hold that the plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. What those items are is somewhat difficult to determine. For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably. The damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events; but eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions. There must not be two steps between cause and damage. We have followed this rule in the decision as to the different items of claim shown in the Conclusion of Law.

*Myerle v. United States*, 33 Ct.Cl. at 27. Thus, interference with other business resulting from the breach was excluded from the damages. The inadequacy of "foreseeability" alone to distinguish allowable from unallowable items of cost or loss, is plain. Even though antecedently considered, injury to the other party is not only "possible,"

but even "probable;" in case of a breach, it may not be allowable. Judge Davis' formulation is, I believe, about what we apply today and, on applying it to our present case, the result we reach is unavoidable. I doubt if any showing in Prudential's power to make could have sufficed to obtain a different result. My dissent in *Northern Helex* was naive in treating the ostensible test of "foreseeability" as the real one.

The inadequacy of damages in case of government contract breach has become anomalous in contrast to the generosity with which damages are today awarded in other contexts. While damages are supposed or imagined to provide a disincentive to violating the legal rights of others, the government here may even enjoy incentives to commit such violation in some circumstances, when equitable relief and tort liability are both unavailable. I am not advocating judicial lawmaking, however. The matter would appear to call for congressional attention as it involves the waiver of sovereign immunity.