Nichols, Judge,
delivered the opinion of the court :*
This case comes to us on the defendant’s exceptions to Trial Judge Louis Spector’s recommended decision, filed September 22, 1972. Careful consideration has been given to the numerous exceptions made by the plaintiff to the factual findings of the trial judge. All findings of fact necessary to the decision of this case are included in this opinion.
The corporate plaintiff, Westchester Better Homes, Inc., assigned a bond and mortgage that it held to the Internal Revenue Service for the accommodation of the individual plaintiffs, Mr. and Mrs. George S. Groves, Sr., as collateral security for the payment of the latter’s acknowledged income tax liabilities. Plaintiffs sue for breach of that assignment agreement, charging that defendant failed to enforce and comply with the terms of the bond and mortgage, thereby collecting only $22,685.11 thereon instead of the face amount of $101,600 plus 6 percent interest. Defendant has counterclaimed for the taxes owed by the individual plaintiffs in the amount of $108,545.71, together with interest.
The amounts of the claim and counterclaim cannot be stated with precision at this point because plaintiffs also seek compensation for the interest accruing against them on the tax assessments which, it is claimed, would not have accrued *664 bad the assignment agreement not been breached. Furthermore, the interest payments on both the claim and counterclaim, and their interaction, tend to complicate the accounting aspects of this case. But those problems need not be reached in this opinion, in light of our Buie 131(c).
Mr. and Mrs. Groves, Sr., the individual plaintiffs, owned a 28-acre tract of land, consisting of two parcels in the town of North Castle, Westchester County, New York. Sometime prior to June 21,1961, they conveyed the land to the corporate plaintiff, Westchester Better Homes, Inc. On June 21, 1961, notices of federal tax lien were filed against Mr. Groves in Westchester 'County in the amount of $33,259.55 for the years 1947 through 1950; and against Mr. and Mrs. Groves in the amount of $48,067.69 for the years 1951 through 1954. On August 29, 1962, a similar notice was filed against Mr. and Mrs. Groves in the amount of $22,363.32 for the years 1955 and 1956.
Westchester held the land for sale as a realty subdivision with 10 proposed lots in the first parcel and 18 in the second, each approximately 1 acre in size. All of Westchester’s stock was owned by Financial Credit Corporation, which was in turn wholly owned by American Holding Corporation. George S. Groves, Jr., plaintiffs’ son, owned a majority of the shares of the latter corporation.
On February 22, 1965, Westchester contracted to sell the entire tract of land to a Mr. Zachery [Zachary] Marantis who planned to construct homes on each of the 28 lots for sale to individual purchasers. The sale price was $112,000, and there is nothing in the record to indicate this was not a fair price. Mr. Marantis agreed to pay $10,400 in cash and to give West-chester a purchase money bond and mortgage for the balance of $101,600.
In return for discharge of the tract from the effect of the federal tax liens earlier described, plaintiffs on March 8,1965, agreed to assign the bond and mortgage to the District Director of Internal Bevenue, Manhattan District, New York, in these terms:
NOW, THEBEFOBE, in consideration of the DIBEOTOB issuing a discharge of such improved real *665 property, in the form customarily employed for such a discharge by him, from the effect of the said federal tax liens, the TAXPAYERS and HOMES [Westchester] agree, as follows:
1. Simultaneously with the delivery of such a discharge to HOMES, HOMES will assign the purchase money mortgage hereinabove referred to, together with the bond or obligation described in said mortgage and the moneys d/ue a/nd to grow due thereon with the interest to the DIRECTOR, and will notify the mortgagor of such assignment, and will instruct the said mortgagor to make all payments d/ue or to beeome due u/nder the terms of such mortgage, to the DIRECTOR, at 120 Church Street, New York, New York.
2. The DIRECTOR agrees to apply all payments received by him pursuant to the terms of the said mortgage, to the outstanding tax liabilities of the TAXPAYERS hereinabove described. [Emphasis supplied.]
* * * * *
The closing of the real estate transaction, and the assignment of the bond and mortgage by Westchester to the District Director, for the individual and joint accommodation of Mr. and Mrs. Groves, took place on March 29,1965. The grantee and mortgagor of the land was actually Wiltshire Estates, Inc., a corporation wholly owned by Mr. Marantis and by Thomas A. Mamalis, attorney for Wiltshire.
An attorney in the Office of Regional Counsel, Internal Revenue Service, Alexander W. Kogan, Jr., had drafted the assignment agreement, and it was the function of Counsel’s office to advise the Director of the Service’s rights and obligations under the assignment.
The $101,600 bond and mortgage assigned carried interest at the rate of 6 percent per annum beginning March 29,1965, on the portion of the mortgage allocated to parcel I; and beginning March 29,1966, on that portion allocated to parcel II. The mortgage was payable at the rate of $50 per month per lot commencing on the date of sale of each lot on which a house was constructed and sold. However, the mortgage also *666 contained the following schedule of minimum monthly payments due regardless of the number of lots sold:

Date Amount

Payment due 3 mos. after sale of first home-$150 per mo.
a tt 0 tt tt tt tt tt tt $250 “ t{
tt ft q ft it tt tt tt tt $400 “
“ “ 12 “ “ “ “ “ “ $500 “ “
These monthly payments were first to be applied to interest due, and the balance to principal.
Paragraph “B” of the mortgage contemplated the complete release of lots from the lien of the mortgage as houses were sold. Payment was to be in cash or in the alternative, upon receipt of $1,000 and a second mortgage from the individual purchaser of the lot for the balance, payable in installments of $50 per month with interest at a yearly rate of sis percent.
Paragraph “C” provided that releases for the ten lots in parcel I were to be executed by Westchester simultaneously with the mortgage and were to be held in escrow. After the lots in parcel I were surveyed releases for them were to be similarly executed and held in escrow. The releases for the lots in parcel I were executed on March 29,1965. Each provided for payment of $3,628.57 (%8 of $101,600). These releases were held by the District Director of Internal Revenue Service.
Finally, if fewer than 28 homes were completed on the tract, the balance due with respect to such homes as were not completed within 3 years of the date of the mortgage, was payable over a period of 5 years in equal monthly installments. The mortgage contained the customary provision that upon default in the payment of any installment of principal or of interest for 30 days, the entire principal sum plus interest would become due at the option of the mortgagee.
As later detailed, plantiffs’ claim of breach of the assignment agreement is predicated in part upon the failure of the IRS to require payment of the mortgage an accordance with these terms.
The claim of breach is also predicated upon the IRS’s failure to adhere to another provision of the mortgage under which the mortgagee had agreed:
*667 * * * on demand at any time and from time to time, and without charge therefor, to execute, acknowledge and deliver any agreement or agreements necessary or proper subordinating the within purchase money mortgage or mortgages to a first mortgage made by the purchaser for the purpose of constructing buildings and roads on the subject property, to a tank, savings and loan association or insurance company * * *. [Emphasis supplied.]
A provision such as this is not uncommon in land mortgages since it permits the purchaser to obtain construction funds for further development. The reference “to a bank, savings and loan association or insurance company” was an exclusive reservation drafted for the protection of the mortgagee. Mr. Groves, Sr., believed that recognized lending institutions such as banks and insurance companies would be conservative in advancing construction funds, thereby protecting his purchase money mortgage on the land from dilution, and insuring that the land and improvements would be worth more than the construction loan and mortgage he held on the land.
On October 28, 1965, the Director subordinated the purchase money mortgage which had been assigned to him, to a $25,600 construction mortgage on lot No. 9 of parcel I, running to the Yonkers Savings and Loan Association. Mr. Mamalis, attorney for Wiltshire, had previously obtained specific consent to this subordination from plaintiffs. Because the parties realized that individual consents to each subordination would be 'burdensome, plaintiffs on October 30, 1965, furnished the Director the following general consent agreement:
WE, the undersigned hereby consent and approve to any and all subordination agreements executed by Edw. J. Fitzgerald, Jr., successor in office to Charles A. Church, former District Director of Internal Revenue, Manhattan District, New York, New York, or his successors, in connection with a certain mortgage dated March 29th, 1965, made by Wiltshire Estates, Inc. to Westchester Better Homes, Inc., recorded Liber 6807 mp 458 in the office of the Clerk of the County of West-chester (Division of Land Records) assigned by agreement dated March 29th, 1965 by Westchester Better Homes, Inc. to Charles A. Church, District Director of *668 Internal Revenue, Manhattan District, New York, New York, and recorded in the office of the Clerk of the County of Westchester (Division of Land Records) in Liber 6807 at page 456.
Dated October 30,1965
Westchester Better Homes, Inc. by: George S. Groves, Sr. /s/ President
George S. Groves /s/
Mabel M. Groves /s/
¡It is apparent that the purpose of this consent agreement was to avoid the nuisance of individual consents to each subordination, and that it was not intended by plaintiffs as a waiver of any of the payment and subordination provisions of their assigned purchase money mortgage.
Thereafter the Director subordinated the assigned mortgage to three construction mortgages, one on each of lots 1, 7 and 8 of Parcel I running to Yonkers Savings and Loan, each in the amount of $25,600. The mortgage on lot 10 was similarly subordinated in the amount of $26,700. All of the five construction mortgages running to Yonkers Savings and Loan were paid when the sale was closed for each house constructed.
In January 1966, an attorney in the Regional Counsel’s Office, Internal Revenue, Hyman Marón, took over the advisory functions previously performed by the earlier-mentioned Mr. Kogan. His advice to the Director bears on the events which subsequently transpired. It is therefore worthy of note that he 'had some experience in the procedures relating to tax liens, but had never personally obtained a construction loan from a bank, savings and loan association or an insurance company.
By April 1966, the Director began releasing individual lots from the mortgage as they were improved and made available for sale to individual purchasers. Specifically, on April 18 and April 26, 1966, he released lots Nos. 9 and 8, respectively, of parcel I, for $3,628.57 each. However, the release of lot No. 8 was granted to Wiltshire for only $1,000 in cash, and an oral promise by Wiltshire to pay the balance *669 of $2,628.57, plus interest at 6 percent per annum, at the rate of $50 monthly, commencing 1 month after closing. It will be observed that this was not in accordance with the payment provisions of the mortgage. In fact the Director never collected any part of the deferred consideration for the release of lot No. 8.
By way of contrast, on August 31, 1966, the Director released lot No. 10 of parcel I for $3,628.57; $1,000 in cash and a $2,628.57 second mortgage from the purchaser of the lot. That second mortgage was paid off at the rate of $50 per month, as provided therein.
The regular procedures followed by the Director in releasing lots from the assigned mortgage were worked out with Wiltshire. The builder would submit an application together with a proposed form of release. If the offer was for less than $3,628.57 (%8 of $101,600), reasons would be offered in support of a lower amount, and the builder would provide its estimate of the value of the lot sought to be released. The Director would act on the advice of the attorney in the Regional Counsel’s office. He would release the lot if satisfied that the amount offered by the builder was the most the market would then bring.
Meanwhile the Director was not collecting the monthly payments of principal and interest independently due on the mortgage, as earlier described, nor giving any consideration to collecting them. In April, May and June 1966, $100 monthly payments were due from Wiltshire ($50 per house per month), since two houses had then been sold. In July, August and September 1966, $150 per month was due from the mortgagor because 3 months had elapsed since the first house was sold. In October, November and December 1966, $250 per month was due from the mortgagor, this being 6 months after the first house had been sold. In January, February and March 1967, $400 per month was due from the mortgagor, because this was 9 months after the first house had been sold. In April, May and June 1967, and every month thereafter, $500 per month was due from the mortgagor, this being 12 months after the first house had been sold. No effort was made to collect any of these monthly payments, nor any *670 interest, nor to declare the entire principal sum and interest due (upon default in the payment of any installment of principal or of interest) as provided in the mortgage.
We are not offered an explanation for this in the record other than argument of counsel that these payments were deemed to be in lieu of payments resulting from the release of lots, and therefore not required to be made if equivalent or greater sums were being collected upon the periodic release of lots. There is no support for this interpretation of the note and mortgage in the payment provisions of the instruments themselves. In fact, if read in that fashion, the purchase money mortgage would never be paid off, nor would the interest due thereon. As earlier mentioned with respect to lots Nos. 8, 9 and 10, and as will later appear, less than y28 of the mortgage would be accepted from time to time for release of a lot; and no interest would be collected.
The total sum of $22,685.11 eventually collected by the Service on plaintiffs’ assigned purchase money mortgage for $101,600 plus interest, before it was wiped out, consisted therefore of receipts from the release of lots for $3,628.57 per lot, or less. In addition to lots Nos. 8, 9 and 10 earlier mentioned, the Director released lot No. 6 for $3,628.57 on December 15,1966; lot No. 5 for $2,000 on February 14,1967; lot No. 7 for $2,300 on March 2,1967; lot No. 1 for $2,000 on April 5, 1967; and lots Nos. 2, 3 and 4 for $1,500 each on May 18,1967.
In October 1966 Mr. Mamalis of Wiltshire telephoned Mr. Marón in the Eegional Counsel’s office regarding subordination of the assigned purchase money mortgage to a construction loan. In that conversation, Mr. Marón learned that the 23 lots remaining of the original 28 had been conveyed on September 30,1966, from Wiltshire to Limestone ¡Homes, Incorporated, a corporation also wholly owned by Messrs. Marantis and Mamalis and formed shortly before the conveyance.
Mr. Marón also learned in that conversation, that the proposed lender was not Yonkers Savings and Loan, or another approved type of lender, but rather North State Eoad Property, Inc. When Mr. Marón sought an explanation, he was *671 informed that Wiltshire had been having financial difficulties; that Yonkers had refused to provide new construction money; and that a Mr. Mario Chiulli bad agreed to build on the remainder of the tract in return for 40 percent of Limestone’s stock. North State, the proposed lender was wholly owned by Mr. Chiulli’s attorney, Stanley I. Erwin, and had agreed to put up some money if the purchase money mortgage on all the remaining lots was subordinated to a $40,000 note and first mortage. It was proposed that the money loaned by North State would be used for construction of a road through the tract, and completion of five houses in parcel I.
Actually Limestone received only about $28,000 in cash in exchange for this $40,000 note and first mortgage to North State. An additional $5,000 was to be paid Limestone by North State upon completion of the rough-grading of the road; about $2,000 went for expenses in connection with closing the mortgage; and $5,000 is described as a “postponed payment of the cost of obtaining the mortgage.”
Mr. Marón approved the loan from North State, and the subordination to it of the assigned purchase money mortgage on all the remaining lots, because he was of the opinion that he had to do so since the loan was to be used for the road and five houses, regardless of the source of the funds. He did not consider the advisability of a postponement of construction until funds might become more readily available from recognized lending institutions such as Yonkers. 'He did not ask for Limestone’s financial statement, nor did he inquire as to how that new corporation was capitalized. He did not inquire as to how much of the loan money being obtained from North 'State was to go into actual construction, nor did he request an engineering report or an architect’s drawings.
Presumably, Mr. Marón did not consider the possibility of declaring Wiltshire in default, as a better method of preserving plaintiffs’ and the Service’s interest in the land and the assigned purchase money mortgage. His concern was for Limestone, and the possible failure of its development unless funds were obtained from North State.
On November 25, 1966, an involuntary petition in bank *672 ruptcy was filed against Wiltshire by four creditors with claims arising out of construction of houses on lots Nos. 1 and 7. This proceeding was abandoned without prejudice when Wiltshire satisfied the claims with $8,000 advanced by Limestone in exchange for a mortgage which was discharged when these lots were sold.
Plaintiffs’ purchase money mortgage was subordinated to this mortgage running to Limestone, but no damage resulted from the subordination, and plaintiffs have not raised the matter in this proceeding.
The Planning Board of the town of North Castle conditionally approved Wiltshire’s application for subdivision of parcel II on June 12,1967, subject to compliance with 11 conditions set out by the Board. This conditional approval was to expire within 1 year unless the conditions were satisfied, but they were not satisfied by Wiltshire or Limestone.
The $40,000 first mortgage held by North State on all the remaining lots became due and went into default as of July 19, 1967. That mortgage was assigned by North State to William Goldstein on August 2, 1967, and by the latter to Theodore Wolf on September 14,1967. Mr. Wolf brought a foreclosure action on October 4,1967, naming as defendants, Croton Avenue Properties (to which Limestone had meanwhile conveyed the mortgaged property), Limestone, and the District Director of Internal Revenue, among others.
In answer to a request from George S. Groves, Sr., the Director on October 2,1967, sent him a letter with an attached schedule showing his and Mrs. Groves’ tax liabilities, and mortgage payments which had been applied thereto as of September 30,1967. On November 29, 1967, in response to a similar request, the Director furnished Mr. Groves lists of the releases and subordinations of the $101,600 purchase money mortgage.
By letter dated January 30,1969, the Director was offered $35,000 for the assigned $101,600 purchase money mortgage. The offer was made by the earlier-mentioned Mr. Kirwin, who, it will be recalled, was attorney for Mr. Chiulli, and sole stockholder of North State. Mr. Kirwin was also sole stockholder of Croton, to which the property had been con- *673 reyed by Limestone. In response to a request for comments on this offer, George S. Groves, Sr., stated that only small amounts had been paid on the $101,600 purchase money mortgage and that he would appreciate information “as to why the mortgage should be assigned for an amount which is only approximately one-third of its face value.”
Mr. Groves was advised through Counsel that the Service considered it unlikely that a $35,000 surplus for application to the assigned purchase money mortgage would be realized at a foreclosure sale, unless the property was bid in by the taxpayers.
Plaintiffs did not take a position as to acceptance or rejection of this $35,000 offer. By letter of May 26, 1969, Mr. Kirwin was advised his offer had been accepted. However, the accepted offer was never consummated.
A referee’s report incident to the foreclosure of the $40,000 mortgage now held by Mr. Wolf found in part as follows:
The real property covered by the mortgage under foreclosure and which was not released consists of parcel II described in the mortgage, and this consists of approximately 18 acres * * *. This acreage is unimproved and should be sold as one parcel because there has been no official subdivision approved by the Planning Commission of the Town of North Castle. There is a rough-cut road but no utilities were installed on the property such as sewers, electricity or telephone lines. The terrain of the land is swampy; much of it is below road level and wet and damp, and in need of lots of fill. There are trees and marshy land which is wild and uncultivated. * * *
Thereafter, and on December 16, 1970, the land was sold on foreclosure to Green vale Properties, Inc. (assignee of Mr. Wolf, the plaintiff in the foreclosure action), for $50,000. There was no surplus available for application to plaintiffs’ subordinated mortgage, because the amount due the foreclosure plaintiff and the costs of sale totaled $52,074.85, producing a deficiency of $2,074.85.
It is noteworthy that a high bid of $90,000 had been made at the foreclosure sale, but that bidder immediately defaulted, whereupon the land was resold to Greenvale. The referee reported that the defaulting bidder on the first sale was liable *674 under New York law for tire deficiency of $40,000 between the sum for which the premises were struck down upon the first sale, and the sum for which they were purchased on resale. We are not informed on this record that the deficiency claim has been pursued.
This controversy is governed by Federal as opposed to State law since the rights and duties of the Federal Government are involved. Clearfield Trust Co. v. United States, 318 U.S. 363 (1943). In the absence of Congressional or administrative guidance in the form of statute or regulation the Federal Commercial Law “we apply should take account of the 'best in modern decision and discussion.” Padbloc Co., Inc. v. United States, 161 Ct. Cl. 369, 377 (1963). We should use Article 9 of the Uniform Commercial Code as a source of the Federal law of secured transactions for the same reasons that the Second Circuit used the U.C.C. as a source in determining the Federal law of sales in United States v. Wegematic Corp., 360 F. 2d 674, 676 (1966) :
* * * The Code has been adopted by Congress for the District of Columbia, 77 Stat. 630 (1963), has been enacted in over forty states, and is thus well on its way to becoming a truly national law of commerce, which, as Judge L. Hand said of the Negotiable Instruments Law, is “more complete and more certain, than any other which can conceivably be drawn from those sources of ‘general law’ to which we were accustomed to resort in the days of Swift v. Tyson.” New York, N.H. & H.R. Co. v. Reconstruction Finance Corp., 180 F. 2d 241, 244 (2 Cir. 1950). When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States.
When referring to the Uniform Commercial Code we refer to the Code as promulgated by the American Law Institute in 1962. We choose not to utilize the 1972 revision as a source of Federal law since to date it has won only a modicum of acceptance in the state legislatures, and there is no change relevant to the present litigation, anyway.
The trial judge’s report and both the plaintiffs’ and Gov *675 ernment’s briefs erroneously characterize the transaction as a common law pledge rather than an Article 9 security interest. Section 9-104 (j) provides, with minor exception, that the creation of an interest or lien in real estate is not within Article 9. It does not follow that the assigment of a mortgage secured by land is not governed by the Uniform Commercial Code. Section 9-104 (j) must be read in light of Section 9-102 (3) which provides that: “The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.” See, also, the illustration set forth in § 9-102, Comment 4.
In order to create a security interest enforceable by the secured party and secured creditor under Article 9 the following requirements must be met:
(1) The parties must agree to create such an interest,
(2) the evidentiary requirements of Section 9-203(1) (b) must be satisfied or the collateral must be in possession of the secured party,
(3) the debtor must have rights in the collateral; and
(4) the secured party must give value. Sections 9-203, 9-204.
It is clear from the facts that the agreement requirement has been satisfied. The evidentiary requirements of § 9-203 (1) (b) have been met since “the debtor has signed a security agreement which contains a description of the collateral.” Even if this were not the case, the collateral, which consists of the assigned mortgage and the releases executed by West-chester for the ten lots in Parcel I, was in the Government’s possession. § 9-203(1) (a). Westchester’s right to foreclose the mortgage upon the mortgagor’s default constitutes rights in the collateral, since rights includes remedies § 1-201(36). Westchester gave value since the release of the property from the tax lien is “consideration sufficient to support a simple contract”. § 1-201 (44).
Section 9-207 sets out a secured party’s duties when in possession of collateral as follows:
(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel *676 paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.
í* *i» •{« $
(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest.
The parties to a security agreement are also free to determine the terms upon which they deal “except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement.” § 1-102(3). Applying these principles to the facts of this case we reach the following conclusions:
As a secured creditor the IRS was obligated to deal with the note and underlying mortgage with such diligence as to protect their value. § 9-207 (1). This the IRS failed to do as evidenced by its interpretation of the monthly payment provisions; the release of lot 8 for $1,000 and an unsecured promise to pay the balance, and the subordination of the assigned mortgage to North State.
Mr. Maron’s testimony reflected a surprising misunderstanding of the meaning of the mortgage. As indicated in the earlier factual recitation, his interpretation of the monthly payment provisions as being alternative “minimum amounts” required to be collected, would have resulted in less than the principal of the mortgage note being collected, not to mention the interest. The IRS had no right to look exclusively to “release” payments for discharge of the mortgage, particularly when it was often accepting less than 1/>8 of the mortgage principal for the release of a lot.
Also unsupported by the terms of the mortgage was the release of lot 8 to Wiltshire for only $1,000 in cash and an unsecured promise to pay the balance of $2,628/57, plus interest in monthly installments of $50. Here Mr. Marón appeared to be confusing Wiltshire’s obligation under paragraph “A” to make regular monthly payments, with the obligation of an individual purchaser under paragraph “B” to execute a second mortgage for any unpaid balance on his lot, as a condition to its release. Carried to its logical conclusion, *677 this interpretation would have produced only $28,000 in cash, and 28 unsecured promises to pay-the balance of $73,600. This misinterpretation is a clear violation of the IES duty under § 9-207 (1) to use reasonable care in the preservation of collateral in its possession.
The IES subordination of the mortgage on the remaining lots to a $40,000 loan extended by other than a bank, savings and loan association or a mortgage company is another example of negligent interpretation of the assigned mortgage. The approval of this loan is made even more blameworthy due to the fact that it produced only $28,000 for the struggling mortgagors. This was in sharp contrast with the $25,600 or $26,700 fer lot theretofore being advanced by Yonkers Savings and Loan, on a conservative basis. That is precisely why the subordination terms limited subordination to loans from the described financial institutions. Had subordinations to the North State loan not been approved, the development would in all probability have failed. But the IES would then have been in position to protect plaintiffs’ interest and its own by foreclosing on the purchase money mortgage and regaining title to the land. Instead plaintiffs’ interest was wiped out by foreclosure of the North State loan. Little or no care was apparently exercised in approving that subordination, or in examination of the underlying facts.
The release of the other individual lots for less than $3,628.57 was in violation of the agreement assigning the mortgage to the IES as distinguished from the terms of the assigned mortgage. The District Director, as a result of the parties’ agreement, held releases executed by Westchester for each of the lots in Parcel 1. Such releases were part of the security agreement. The releases provided for the payment of $3,628.57. Since such provision falls within the general rule of freedom of contract in § 1-102(3) it must be strictly complied with. Therefore the defendant is responsible for the deficiency when it released a lot for less than $3,628.57, even if the lot released was worth less than the amount received. It may be that prudent management would have let these lots go for less than $3,628.57 each. It is unnecessary to decide this because the District Director was bound by express provisions to the $3,628.57 figure and should have *678 applied to plaintiffs for a waiver if be deemed it necessary to accept a lesser payment.
Defendant’s counsel urges that plaintiffs partially ratified these actions by not objecting to releases of lots made for less than $3,628.57. However, there can be no ratification unless the party charged with ratification knew all the facts and circumstances pertinent to the acts (or omissions) allegedly being ratified, and unless he had sufficient opportunity to object. Due to the untimely death of Mr. Groves, Sr., prior to trial of this case, we are not privy to what he might have known nor to what opportunity, if any, he had to object. The trial judge chose not to believe the little testimony that was addressed to this point at trial. It is not for us to question this finding since only he had the opportunity to observe the witness’ demeanor. Rule 147(b).
All of the foregoing considered, plaintiffs are entitled to recover, as is defendant on its undisputed counterclaim for taxes, and judgment is entered to that effect. As previously indicated, the amounts of the claim and offsetting counterclaim cannot, on this record, be stated with precision. Therefore, the amount of net recovery (presumably on the counterclaim) is reserved for further proceedings under Rule 131 (c). Computation of damages will require a determination of the fair market value of the mortgage. Defendant cannot be said to have had a duty to recover more than that since it did not warrant that the mortgage was worth its face. It may be that the sum of the losses resulting from different breaches by defendant may exceed the fair market value less the ultimate recovery; however, we do not think we can put plaintiffs in a better position than they would have occupied had they not entered into the security transaction here involved.

We are obliged to Trial Judge Louis Speetor for Ms able opinion from which we have borrowed, though we reach the same result through a different route.